2016 IL App (1st) 150560

FIRST DIVISION
MARCH 14, 2016

1-15-0560)
1-15-0751) Cons.

| | | |
|---|---|---|
| *In re* CHELSEA H. and COURTNEY H., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondents-Appellees | ) | Cook County |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | Nos. 13 JA 1005 |
| | ) | 13 JA 1006 |
| v. | ) | |
| | ) | Honorable |
| Christopher H. and Phoebe R., | ) | Nicholas Geanopoulous, |
| Respondents-Appellants). | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondents-appellants Christopher H. (father) and Phoebe R. (mother) (together, respondents) respond, the parents of the minors-respondents-appellees Chelsea H. and Courtney H. (children), appeal from the trial court's denial of their motion to substitute judge. They also challenge the trial court's subsequent findings of abuse and neglect pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-7 *et seq*. (West 2012)), as well as the trial court's dispositional orders.

¶ 2                              BACKGROUND

¶ 3    The mother and father were married in 2006 and are the parents of Chelsea H., born January 15, 2010, and Courtney H., born March 30, 2013. The children were brought to the attention of the Department of Children and Family Services (DCFS) on October 4, 2013, based upon injuries to six-month-old Courtney. On that date, the mother brought Courtney to St. James Hospital in Chicago Heights. Medical records from that date reflect that the mother reported that

Courtney cried when her arm was moved, had experienced "3-4 days of left arm pain," and that Courtney "ha[d] been favoring her left arm for the past couple days." Courtney was diagnosed with fractures in both arms which were "concerning for abuse." However, doctors also noted that Courtney interacted comfortably with the mother, who was "appropriately concerned" about the injuries. St. James discharged Courtney the same day, but contacted DCFS to conduct a home evaluation.

¶ 4    Later on October 4, 2013, DCFS investigator Debra Robinson went to the children's home and interviewed the respondents. Robinson learned that the children attended a day care facility four days a week, and were otherwise cared for by the respondents. The respondents also told Robinson that at certain times, the children were also supervised by their 20-year-old sister, Tiara, and their 15-year-old brother, Reginald, who lived in the same household. The respondents could not explain the origin of Courtney's fractures, except that the mother stated that three-year-old Chelsea sometimes played roughly with Courtney and would "swing[] her by the arms to dance with her."

¶ 5    At the direction of DCFS, later on October 4, 2013, Courtney was taken to the University of Chicago Medical Center's Child Protective Services to be seen by doctors specializing in child abuse. DCFS also initiated a "safety plan" on that date under which the children were placed with their maternal aunt, Brandi Roberson, pending further investigation.

¶ 6    Physicians at the University of Chicago, including Dr. Jill Glick, developed a report opining that Courtney's injuries were "more likely than not" caused by abuse. As a result, DCFS took protective custody of the children on October 30, 2013.

¶ 7    On November 1, 2013, the State filed petitions for adjudication of wardship for Chelsea and Courtney and moved for temporary custody of the children. The court conducted a

temporary custody hearing on November 1, 2013. The respondents were represented by separate counsel. At that time, the court appointed the public guardian to represent the children.

¶ 8    The court made a number of rulings at the November 1, 2013 hearing, none of which were contested. After the father acknowledged that he was the father of the children, the court entered a corresponding written order of paternity. Pursuant to a stipulation in which the parties agreed that the children would remain temporarily with their aunt, the court found probable cause and immediate and urgent necessity to support the removal of the children from the home, and granted DCFS temporary custody. Also at the November 1, 2013 hearing, the court entered orders permitting the respondents to have supervised visits with the children. The next hearing was scheduled for November 22, 2013.

¶ 9    On November 21, 2013, the mother filed a motion to substitute the trial judge pursuant to section 2-1001 of the Code of Civil Procedure (Code), which permits a party to have one substitution of judge without cause if presented before the judge has made a ruling "on any substantial issue in the case." 735 ILCS 5/2-1001 (West 2012).

¶ 10   The court heard argument regarding that motion at the outset of the hearing on November 22, 2013. The mother's counsel argued that she had a right to substitution because "no substantial issue" had been decided in the case, contending that the court's prior rulings were "procedural" and did not "go to the merits of the case." The father's counsel later joined the mother's motion. The State and the public guardian for the children opposed the motion, arguing primarily that the court's November 1, 2013 finding as to the father's paternity was a "substantial" ruling.

¶ 11   After reviewing case law submitted by the parties, the court determined that "the finding of paternity is a substantive ruling" and denied the motion to substitute counsel. The court

reasoned that "by entering the parentage order, I've determined who the parties are going to be" and that the paternity ruling "sets the tone for the case, it sets who the parties are in the case and what the case will look like going forward."

¶ 12    Following denial of the motion to substitute, the November 22, 2013 hearing proceeded with testimony from DCFS investigator Robinson regarding her conversations with the respondents and other family members on October 4, 2013.  According to Robinson, the mother told her that she had taken Courtney to the doctor on October 4, 2013, because she was having trouble moving one of her arms and "wouldn't hold her bottle."  According to Robinson, the only possible cause of injury suggested by the mother was that "the three-year-old [Chelsea] plays very rough with her little sister," and "swings her by the arms *** dancing with her."  Robinson testified that she also interviewed the children's 20-year-old sister and 15-year-old brother, but neither sibling could provide any information as to how Courtney had been injured.

¶ 13    Following Robinson's testimony, the State published excerpts from an October 22, 2013 report by the University of Chicago Comer Children's Hospital Child Protective Services team which was authored by Dr. Jill Glick.  Dr. Glick's report states that Courtney had "unexplained bilateral healing radial and ulnar fractures" in both arms.  Dr. Glick's report states that she had discussed the case with an orthopedic surgeon at the University of Chicago, Dr. Chris Sullivan, who had concurred that these fractures are "unusual" as they were "located in the exact same place on both sides of the body, and are very linear."  Dr. Glick reported that the right arm fractures were "healed and the left one refractured through the same place before it was fully healed."  Dr. Glick's report states that:  "Both fractures are of several weeks at presentation; some event caused refracturing of the left arm."

¶ 14    Dr. Glick's report noted that Courtney's "family has presented no mechanism for these injuries" and that they were "unusual both that they are in the same location and also in a baby without history."  Dr. Glick's report stated that she was "suspicious of child abuse," for several reasons, including that: "babies that are not ambulatory are in the care of adults" who should be aware of any injury, "fractures in babies are rare," and the "bilateral nature of these injuries is quite unusual."  Dr. Glick's report also noted her concern "that the mother knew of something wrong three days prior and did not seek care."

¶ 15    The mother also testified at the November 22, 2013 hearing that she took Courtney to the emergency room after Courtney screamed during a feeding.  The mother stated she "was trying to get [Courtney] to hold her own bottle, and when I lifted up her left arm she started screaming." The mother denied that she had noticed problems with Courtney's arm prior to October 4, 2013.

¶ 16    The mother testified that when the doctor at St. James asked about possible causes for Courtney's injuries, she told him "my three-year-old daughter *** plays a little rough with her and then I have to reposition her a lot during the middle of the night because she lays on her arms in weird ways."  The mother testified that Chelsea "wants to dance with [Courtney], pull on her arms" and "plays with her like a doll," but denied that Courtney had ever appeared to be hurt from such play.

¶ 17    Following argument by counsel, the court found probable cause that the children had been abused or neglected and granted temporary custody to DCFS.

¶ 18    The adjudication hearing commenced on December 17, 2014.  DCFS investigator Robinson again testified that the mother could not explain the cause of Courtney's injuries except that "the three year old [Chelsea] swings her by the arms to dance with her."  Robinson also testified that the mother said she slept in the same bed as Courtney and had "admitted that she

has rolled on the baby a couple of times."  Robinson testified that she spoke briefly with the father, but he also could not tell how Courtney was injured.

¶ 19    The court next heard testimony from Dr. Glick, medical director of the child protective services team at the University of Chicago.  Without objection, the court found Dr. Glick qualified to testify as an expert in pediatrics and child abuse pediatrics.

¶ 20    Dr. Glick testified that although she did not personally examine Courtney, she had discussed the case with the treating physicians, reviewed medical records from St. James and the University of Chicago, and had also discussed the case with investigators from DCFS and the police.  Dr. Glick testified that Courtney sustained "symmetric fractures" to the radius and ulna on both arms.  Both arms had "evidence of healing old fractures" which she estimated were two to three weeks old.  In addition, Courtney's left arm had an acute "reinjury" which Dr. Glick described as "a broken bone through an old healed area."  Dr. Glick estimated the refracture was "relatively young, within a few days old."

¶ 21    Dr. Glick testified that the fractures were unusual as they were "pretty much the exact [same] location" in both arms.  She testified it is rare to see "symmetric injuries like this in natural occurring phenomenon where there's an accident" and that it is "very rare to see bilateral symmetric injuries in children."  She also testified that such fractures would have required "forces that are out of the normal caretaking or activity range" for children of Courtney's age.

¶ 22    Dr. Glick testified that she consulted with other physicians at the University of Chicago, including Dr. Sullivan, regarding the injuries.  She stated that she had asked Dr. Sullivan "how he, as an orthopedic surgeon, would create such injuries" and he replied that he "would place a child's arms on a window sill and slam the window shut."

- 6 -

¶ 23    Dr. Glick testified that in her opinion, Courtney's injuries were "highly suspicious for child abuse."  She explained that self-inflicted injuries are rare in children who are unable to move on their own, such as six-month-old Courtney.  Dr. Glick testified that a child as young as Courtney should have been supervised, and that her caretaker should have been aware of such an injury.

¶ 24    Dr. Glick testified that Courtney would have cried in pain upon the original fractures, as well as upon the refracture.  Dr. Glick opined that Courtney would have been in noticeable pain for the first few days after the original injury, including when her clothes were changed or when she was bathed.  Dr. Glick also testified, based upon her review of DCFS interviews and medical records, that the respondents had been aware that Courtney was not using her left arm properly for two or three days before October 4, 2013, which she described as "medical neglect."

¶ 25    Dr. Glick acknowledged that it was "hypothetically" possible that Chelsea could have caused the fractures, but opined that it was "highly improbable that a three year old could generate this kind of symmetric forces to cause these fractures."  Dr. Glick further opined that since the fractures in both arms were "perfectly lined up," it was implausible that they were caused by a three-year-old.

¶ 26    The adjudication hearing continued on January 6, 2015, at which time the respondents called Dr. Christopher M. Sullivan, who testified that he was "the chief of Pediatric Orthopedics and Scoliosis on the medical school faculty" at the University of Chicago.  The father's counsel tendered Dr. Sullivan as an expert in orthopedic pediatric surgery as well as fractures.  After Dr. Sullivan acknowledged in *voir dire* that only about 15 percent of his work involves fractures, the State and the public guardian objected to his being qualified as an expert in that area.  The court thus found Dr. Sullivan to be an expert in pediatric orthopedic surgery, but not fractures.

¶ 27    Dr. Sullivan testified that he had examined Courtney on October 10, 2013.  He observed she had fractures of the radius and ulna "on both the left and the right side that were linear and at the very same level of the bones."  He explained that the left arm had been "refractured through a partially-healed bone" and estimated the original injury to be "about three weeks old." Dr. Sullivan opined that the reinjury of the left arm could have been caused by "normal handling" by an adult and may have happened as late as October 4, 2013.

¶ 28    Dr. Sullivan testified that it was "unusual to see such symmetric fractures" on both arms and that the nature of the injuries "suggest[s] there was some sort of straightedge that was involved with causing the fracture, car seat, chair, something where the arms could have hit against it."  Dr. Sullivan opined that the injuries could be caused by Courtney's three-year-old sibling hitting the arms against a straightedge such as a table or crib railing.  Dr. Sullivan opined that in this scenario, Courtney "would likely have cried for a few minutes and then would stop crying and might fall asleep."  Dr. Sullivan denied that Courtney would be in pain whenever her arms were touched after the injury, but instead opined that she "would be able to move the arm and not experience a lot of difficulty."

¶ 29    Dr. Sullivan acknowledged that it was "concerning" to see such an injury in a six-month-old because a child that age must be supervised by adults.  He stated "it's very likely that some other person either adult or child was involved with producing the forces that caused this, but that doesn't mean that they weren't accidental."

¶ 30    Dr. Sullivan testified that an adult could have accidentally caused the injury without realizing it, opining that Courtney's symptoms "were very subtle and difficult to pick up until two days before they show up at the emergency room."   He further opined that he would not be concerned even if the parents had waited two days before bringing Courtney to the hospital,

explaining: "in the absence of swelling or bruising or obvious deformity," "to wait a couple days *** doesn't seem beyond what a reasonable parent would do."

¶ 31    Dr. Sullivan doubted Courtney's injuries were caused by abuse because it was "hard to explain who *** would choose that particular mechanism to punish the child" and stated that it would be difficult to inflict a symmetric injury.  Thus, Dr. Sullivan opined that the injuries were more likely than not caused accidentally.

¶ 32    On cross-examination, Dr. Sullivan testified that the fractures could have been caused by a window sill coming down on Courtney's arms, or if someone grabbed her hands and "hit[] them over something that was a straightedge."  Dr. Sullivan agreed that since Courtney was nonambulatory, someone else must have been involved in the injuries, whether or not they were accidental.  Nevertheless, Dr. Sullivan opined that there was only a 3% to 5% chance that these injuries were nonaccidental.

¶ 33    Following Dr. Sullivan, the mother called Michelle Hill, director of the day care facility attended by the children.  She testified the day care center performed daily "healthy checks" of its participants but that there were no reports of injuries to the children.

¶ 34    Following Hill, the mother called Brandi Roberson, the children's aunt.  Roberson testified that "Chelsea was a little rough with [Courtney]" and "liked to play with her like she was a doll."  Roberson also testified that Courtney "slept on her arms."  Roberson testified that the parents had acted appropriately with the children, and she denied that she ever observed Courtney favoring one arm over the other.

¶ 35    The mother also testified at the adjudication hearing.  She stated that on the morning of October 4, 2013, she brought Courtney to the emergency room after noticing during a bottle feeding that Courtney would scream and "get hysterical" when her left arm was touched.  When

doctors asked about a possible cause of the injuries, she recalled: "the only thing I could come up with is that my three-year-old daughter Chelsea plays with her and tries to move her arms all the time." She also told the hospital that Courtney "has an unusual way of lying on her arms." The mother testified that she had not thought that Chelsea could have harmed Courtney, because Courtney had always laughed or smiled when Chelsea played with her. The mother denied stating that she had noticed Courtney favoring her arm for two days earlier. She also denied ever stating that she had rolled over on Courtney.

¶ 36    In closing arguments on February 3, 2015, the State asked for findings that Courtney was abused and neglected due to an injurious environment. For Chelsea, the State also sought findings of neglect due to injurious environment and abuse due to substantial risk of injury.

¶ 37    In issuing its ruling on February 3, 2015, the court explained it found no "real indication that the injury occurred at the daycare." The court did find that "there was some delay in seeking medical care initially for Courtney" and that "the child was probably guarding the arm prior" to being taken to the hospital.

¶ 38    The court extensively discussed the opinions of Dr. Glick and Dr. Sullivan. The court noted that "their areas of expertise are a little different," but stated that: "In terms of what I found them to be an expert in, I don't think it really makes a whole lot of difference in terms of the weight given to the testimony."

¶ 39    The court recognized there was no clear testimony that anyone saw the injuries occur, and recognized the conflict between Dr. Glick's and Dr. Sullivan's opinions as to whether the injuries were intentional. The court proceeded to explain that it found Dr. Glick's testimony "more credible." The court recognized that Dr. Sullivan had actually examined Courtney, but

nevertheless found that "Dr. Glick's testimony was a lot more detailed and a lot more fact driven."

¶ 40    The court noted that although Dr. Sullivan offered several possible mechanisms of injury, it found they were not "plausible" especially since Courtney "wasn't ambulatory at all."  With respect to Dr. Sullivan's opinion that Chelsea could have inflicted the injuries, the court credited Dr. Glick's contrary opinion testimony and remarked: "I just don't think, quite frankly, that a three-year-old would generate that kind of force to cause the breaking of the arms."  The trial court emphasized that Courtney's nonambulatory status "changes the possibility that these injuries could be accidental because it's just common sense.  The child isn't moving around.  The child isn't going anywhere."  The court noted that even Dr. Sullivan had acknowledged that because Courtney could not move on her own, "someone else or some other mechanism had to be involved to generate the injuries."  The court separately found it "problematic" that Dr. Sullivan had opined there was a 3% to 5% chance that the injuries were non-accidental.  The court noted that the percentage figure "seems to be something that he just pulls out the thin air, quite frankly" and found it not "particularly credible."

¶ 41    The court concluded that it was more likely than not that the injuries were intentional and not accidental.  The court noted that it was not required to "name a perpetrator" and did not make such a finding.  The court concluded the State proved "a lack of getting the child medical care initially" sufficient to prove abuse and neglect of Courtney, and also found neglect with respect to Chelsea.  The court entered adjudication orders on February 3, 2015 finding that Courtney had been abused under the "physical injury" and "substantial risk of physical injury" provisions of the Act (705 ILCS 405/2-3(2)(i)–(ii) (West 2012)), and that she was neglected due to an

injurious environment. See 705 ILCS 405/2-3(1)(b) (West 2012). The court separately entered an order finding Chelsea neglected due to an injurious environment. See *id.*

¶ 42    On February 25, 2015, the court conducted a dispositional hearing where the court heard testimony from Felicia Shell, the children's case manager. Shell testified that the children had remained in the home of their aunt, Brandi Roberson, and that there was no sign of abuse or neglect in that home. Shell testified that the mother and father had supervised visitation with the children at Roberson's home, and that there had been no issues with the visits.

¶ 43    Shell testified that the respondents had participated in certain recommended services but that more services were needed. Shell testified that while the mother was actively engaged in individual therapy she was "depressed" with the circumstances of her children's case and needed more therapy. Shell indicated she had not learned from the mother's therapist whether the mother had acknowledged that Courtney's injuries were nonaccidental, and could not state whether the mother had otherwise made progress in therapy.

¶ 44    In addition to therapy, Shell testified that both the mother and father needed to complete a 16-week "nurturing parenting program." Shell testified that the respondents had initially expressed concern about the program. Shell explained that due to the respondents' initial resistance they had missed the opportunity to begin the most recent 16-week program in their area in November 2014. Shell explained that the parents had since expressed willingness to participate in the next program in March 2015.

¶ 45    Shell also testified that the mother needed parent-child psychotherapy, as well as a psychiatric evaluation as she had become "depressed" about the children's case. Shell acknowledged that although the therapist earlier reported that the mother did not need a psychiatric assessment, the mother had become more "visibly depressed."

¶ 46    Shell testified that the father was also receiving individual therapy, but Shell could not say whether the father had acknowledged any responsibility for the case. Shell agreed that the father continued to question whether Courtney's injuries were accidental. Shell opined that it was in the children's best interests to be adjudged wards of the court while the respondents completed the needed services.

¶ 47    After arguments, the court found that it was in the best interests of the children for them to be adjudged wards of the court and to remain in DCFS custody to "give the parents additional time to engage in services and aim toward reunification." The court found the respondents had made "some progress" but not "substantial progress, because there has been some delay in the parenting class." The court thus found that the respondents were unable, but not unwilling, to care for, protect or discipline the children, and that return home was not yet in the children's best interests. On February 25, 2015, the court entered corresponding disposition orders adjudging the children wards of the court, specifying a goal of the children's return home in 12 months.

¶ 48    On March 3 and March 4, 2015, the father and mother filed notices of appeal from the findings from the adjudicatory and dispositional hearings.

¶ 49                                ANALYSIS

¶ 50    We note that we have appellate jurisdiction because the respondents filed timely notices of appeal pursuant to Illinois Supreme Court Rule 303(a) (eff. May 30, 2008).

¶ 51    The mother and father raise several distinct arguments. First, as a procedural matter, both respondents argue that the court erred in denying their motion for substitution of judge as a matter of right pursuant to the Code.

¶ 52    Separately, the mother also argues that the trial court erred in declining to find Dr. Sullivan qualified to testify as an expert in fractures. The parties also challenge the findings of

abuse and neglect, claiming that the findings were against the manifest weight of the evidence or resulted from misapplication of the Act. The mother also challenges the court's findings following the dispositional hearing. Finally, the father raises a constitutional due process challenge.

¶ 53    First, we address the respondents' arguments that the court erred in denying the mother's motion for substitution of judge pursuant to section 2-1001 of the Code. Section 2-1001(a) of the Code provides that "Each party shall be entitled to one substitution of judge without cause as matter of right." 735 ILCS 5/2-1001(a)(2)(i) (West 2012). "An application for substitution of judge as of right shall be made by motion and shall be granted if it is presented before trial or hearing begins *and before the judge to whom it is presented has ruled on any substantial issue in the case*, or if it is presented by consent of the parties." (Emphasis added.) 735 ILCS 5/2-1001(a)(2)(ii) (West 2012).

¶ 54    "The right to substitution of judge is absolute when properly made ***. [Citation.] However, to prohibit litigants from 'judge shopping' and seeking a substitution only after they have formed an opinion that the judge may be unfavorably disposed toward the merits of their case, a motion for substitution of judge as of right must be filed  ***  before the trial judge considering the motion rules upon a substantial issue in the case. [Citation.]" (Internal quotation marks omitted.) *Cincinnati Insurance Co. v. Chapman*, 2012 IL App (1st) 111792, ¶ 23. Our court has noted that "cases concerning such a motion appear to use the terms 'substantive' and 'substantial' interchangeably." *In re D.M.*, 395 Ill. App. 3d 972, 976 (2009). "A substantive ruling is one that directly relates to the merits of the case." *Id.* "Our review of a trial court's ruling on a motion for substitution of judge as of right is *de novo*." *Id.* at 977.

¶ 55    In this case, prior to the motion for substitution of the trial judge, the trial court had made several rulings, including: entering a finding of paternity, appointing the public guardian, finding probable cause for DCFS to take temporary custody, and ordering supervised visitation.  The respondents argue that none of these was a "substantive" or "substantial" ruling.

¶ 56    We disagree.  Rather, we agree with the stated reasoning of the trial court that, at least, the order of paternity was a ruling "that directly relates to the merits of the case."  *Id.* at 976. Although the parties have not cited to any case directly on point, we have little difficulty concurring with the trial court that a paternity finding directly relates to the merits of the case. The identity of a minor's parents is clearly relevant to the goals of a proceeding under the Act. The Act's legislative purpose, in part, is "to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare *** cannot be adequately safeguarded without removal."  705 ILCS 405/1-2(1) (West 2012).  Further, the father's rights to participate in this proceeding were dependent in part on his status as the children's parent.  See 705 ILCS 405/1-5 (West 2012) ("[T]he minor who is the subject of the proceeding *and his parents* *** who are parties respondent have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses *** [and] the right to be represented by counsel."  (Emphasis added.)).

¶ 57    Moreover, as noted by the public guardian, the Illinois Parentage Act of 1984 (Parentage Act) further demonstrates that a finding of paternity affects substantial rights.  The Parentage Act "recognizes the right of every child to the physical, mental, emotional and monetary support of his or her parents under this Act."  750 ILCS 45/1.1 (West 2012).  That statute defines "parent and child relationship" to mean "the legal relationship existing between a child and his natural or adoptive parents *incident to which the law confers or imposes rights, privileges, duties, and*

- 15 -

*obligations.*" (Emphasis added.) 750 ILCS 45/2 (West 2012). Obviously, the finding of paternity substantially relates to the father's duties toward the children in this case. As the November 1 order of paternity was a substantial order, the subsequent motion for substitution as of right was untimely. Thus, we need not separately discuss whether the other orders entered prior to the substitution motion were substantial.

¶ 58    Having concluded that the substitution of judge motion was properly denied, we turn to the respondents' remaining contentions. First, we note the mother's argument that the trial court erred in not finding Dr. Sullivan to be an expert in fractures (notwithstanding that he was allowed to testify as an expert in pediatric orthopedics). She claims the trial court abused its discretion by "[f]inding Dr. Glick to be an expert in child abuse pediatrics while not finding Dr. Sullivan to be an expert in fractures."

¶ 59    Notably, the mother does *not* argue that Dr. Sullivan was precluded from offering any testimony because he was not found to be an expert in fractures. Rather, it appears that the substance of his testimony would have been identical regardless of that ruling. Moreover, the trial court expressly stated that: "In terms of what I found [Dr. Glick and Dr. Sullivan] to be an expert in, I don't think it really makes a whole lot of difference in terms of the weight given to the testimony."

¶ 60    In any case, we find no abuse of discretion. "A trial court's determination as to whether a person is qualified to testify as an expert witness will not be disturbed absent an abuse of that discretion. [Citation.] In determining whether there has been an abuse of diction, this court does not substitute its judgment for that of the trial court ***." *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4 (2007). "A trial court abuses its discretion only if it act[s] arbitrarily *** or if no reasonable person would take the position adopted by the court."

(Internal quotation marks omitted.) *Id.* In this case, Dr. Sullivan conceded in the State's *voir dire* that only 15% of his work concerns fractures. Given that admission, we cannot say that "no reasonable person" would agree with the trial court's decision not to qualify Dr. Sullivan as an expert in fractures. Thus, we find no error in that ruling.

¶ 61    Next, we address the respondents' challenges to the court's findings of abuse and neglect. With respect to Courtney, the court made two findings of abuse pursuant to the Act based on "physical injury" and "substantial risk of physical injury" (705 ILCS 405/2-3(2)(i)–(ii) (West 2012)) as well as a finding of neglect based on injurious environment. 705 ILCS 405/2-3(1)(b) (West 2012). With respect to Chelsea, the court made a single finding of neglect due to injurious environment. See *id.*

¶ 62    We first examine the parties' arguments regarding the findings that Courtney was abused. "The trial court has broad discretion when making the determination of whether a child has been abused or neglected. [Citation.] This court will not disturb the trial court's findings unless they are against the manifest weight of the evidence or the findings are manifestly unjust. [Citation.]" *In re Audrey B.*, 2015 IL App (1st) 142909, ¶ 32. "A finding is against the manifest weight of the evidence if a review of the record makes it clearly evident that the opposite result would be the proper result. [Citations.] This deference to the trial court is warranted by its superior ability to observe the witnesses for purposes of assessing credibility to weigh the evidence. [Citation.]" *Id.*

¶ 63    In this case, the trial court found that Courtney was abused under section 2-3(2)(i) of the Act, which provides that a minor is abused if a parent or other person responsible for the minor's welfare "inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means." 705 ILCS 405/2-3(2)(i) (West 2012). Courtney was also found

to have been abused under section 2-3(2)(ii) of the Act, which applies if a parent or other person responsible for the minor "creates a substantial risk of physical injury to such minor by other than accidental means." 705 ILCS 405/2-3(2)(ii) (West 2012).

¶ 64    The mother argues that the State did not meet its burden of proof and that the court's findings of abuse were unreasonable, arbitrary, and contrary to the manifest weight of the evidence.   She argues the trial court improperly found that the parents' "lack of explanation for the injury automatically constituted abuse." She also urges that the trial court erred by disregarding Dr. Sullivan's explanation that the injuries could have been caused unintentionally.

¶ 65    The mother's arguments are not persuasive.  First, as noted by the trial court, the State was not required to prove, and the court did not need to determine, whether Courtney's injuries had actually been inflicted by the respondents or any other particular person.  The Act specifies that abuse occurs if the minor's parent "inflicts *** *or allows to be inflicted* upon such minor physical injury, by other than accidental means."   (Emphasis added.) 705 ILCS 405/2-3(2)(i) (West 2012).  Thus, the State was not required to prove the identity of the person who inflicted the injuries, only that the respondents had "allowed" the injuries to occur.  See *In re R.G.*, 2012 IL App (1st) 120193, ¶ 35 ("[T]he focus of an adjudicatory hearing is not whether the respondent abused the minor but rather on whether the minor was abused. [Citation.]   Therefore, who committed the alleged abuse *** is of no particular consequence in an adjudicatory hearing.").

¶ 66    Further, contrary to the mother's suggestion that the State relied solely on the parents' lack of an explanation to prove abuse, the State did submit affirmative evidence (through Dr. Glick's expert testimony) that Courtney was abused.  Dr. Glick, who was qualified without objection as an expert in child abuse pediatrics, testified that in her opinion the injuries were likely the result of abuse.  The court could certainly find that opinion credible, particularly as it

was undisputed that six-month-old Courtney could not walk or stand on her own. Indeed, even Dr. Sullivan admitted that someone else had to be involved in the injuries given Courtney's non-ambulatory state. Further, Dr. Glick testified that Courtney would have cried for a few days after the fractures to her arms were inflicted. The trial court could reasonably infer that, had the injuries been inflicted accidentally, it was implausible that the respondents would not have noticed. Further, if the baby sustained two symmetrical fractures of the arm and none of the adults who are responsible for her noticed that she was hurt, that in and of itself, could be seen as abuse and neglect. Similarly, an environment in which a baby could suffer such serious injuries without anyone noticing at any time can certainly be characterized as an injurious environment.

¶ 67     The mother's argument relies largely on Dr. Sullivan's testimony and urges that the trial court made "arbitrary and unreasonable assessments of the physicians' credibility." For example, she argues that Dr. Glick "had significant bias" because her team receives funding from DCFS; that the trial court failed to give "sufficient weight" to the fact that Dr. Sullivan had examined Courtney; and that the court should have given more weight to Dr. Sullivan's opinion that rare injuries are not necessarily intentional. In short, the mother asks us to second-guess the trial court's credibility determinations. However, "it is well settled that the trier of fact is in the best position to weigh the credibility of experts, leaving us reluctant to second-guess the findings of the trial court in a battle of experts." (Internal quotation marks omitted.) *Id.* ¶ 39.

¶ 68     The trial court's decision to credit Dr. Glick was not arbitrary. Rather, the trial court explained its reasoning for finding Dr. Glick more persuasive, including: the rarity of such symmetrical injuries; the fact that Courtney was nonambulatory; and the lack of any expressed basis for Dr. Sullivan's opinion that there was only a 3% to 5% chance that the injuries were nonaccidental. We note that, in a recent case also involving bilateral fractures to a child, we

affirmed a trial court's decision to credit the State's expert witness over Dr. Sullivan's contrary testimony, including his opinion that "the likelihood [the minor's] injury was produced from nonaccidental trauma was only 1% or 2%." *In re Audrey B.*, 2015 IL App (1st) 142909, ¶ 42. In *Audrey B.*, we found that the trial court's findings were not against the manifest weight of the evidence where "the trial court conscientiously evaluated the relative merits of the experts' opinions and clearly articulated its reasons for discounting Dr. Sullivan's opinions." *Id.* ¶ 41. Likewise, in this case, the court logically explained why it found Dr. Glick's testimony to be more credible than Dr. Sullivan's.

¶ 69    Separately, the mother argues that the trial court's findings of abuse and neglect cannot stand in light of our supreme court's holding in *In re A.P.*, 2012 IL 113875, which reversed a trial court's finding that the respondent's children were neglected due to an injurious environment. The respondent mother in *A.P.* had left her two children in the supervision of her boyfriend, McLee (who was not the children's father), while she went to an appointment. *Id.* ¶ 3. When the respondent returned, she discovered that one of the children, A.P., had been burned on his face, and she immediately took A.P to the emergency room for treatment. *Id.*

¶ 70    The State alleged that A.P. was neglected because "(1) McLee had burned A.P's face with hot water by other than accidental means; (2) the burns to A.P's face could not have occurred absent abuse or neglect on the part of McLee; and (3) McLee had lied to police about the incident but later told them that he had left the minors unsupervised with the bathwater running ***." *Id.* ¶ 4. The trial court specifically declined the mother's request for a finding that she had not contributed to the injurious environment, since she had made the decision to leave the minors in McLee's care. *Id.* ¶ 10.

¶ 71    Our appellate court reversed the trial court, concluding that the finding of neglect was against the manifest weight of the evidence. *Id.* ¶ 12. Our supreme court agreed, rejecting the proposition that "the State can obtain a finding of neglect due to a babysitter leaving a child unattended, resulting in injury, even without a showing of any knowledge by the parents that the babysitter was an unsuitable caregiver." *Id.* ¶ 24. Our supreme court reasoned that such an interpretation of the Act would "allow a finding of neglect due to an injurious environment *whenever* an injury to a minor could be attributed to improper supervision on the part of a selected caregiver, even in the case of the most conscientious parent who has exerted every reasonable effort in choosing a competent caregiver for his or her child." (Emphasis in original.) *Id.*

¶ 72    Our supreme court reasoned that "in order to support the trial court's neglect findings *** there had to be some indication that respondent knew or should have known that McLee was an unsuitable caregiver." *Id.* ¶ 25. However, in that case "[t]here was no indication that McLee could not provide a safe and nurturing shelter for respondent's children for the duration of the appointment," and no evidence "that respondent had any reason to be concerned about him looking after the children." *Id.* ¶ 26. Moreover, the court emphasized that the "respondent immediately brought him to the emergency room" after discovering the injury. *Id.* Thus, our supreme court found that the finding of neglect was against the manifest weight of the evidence.

¶ 73    In this case, the mother and father make distinct arguments as to why *A.P.* precludes the findings in this case. First the mother argues that, as in *A.P.*, we should conclude that the trial court's findings are against the manifest weight of the evidence because she "never knowingly left her child with a neglectful caregiver." She argues that there was no indication that any of Courtney's other caretakers were unable to provide a safe environment. She argues that "there

must be a nexus between the act of parents and alleged abuse and neglect" and claims that the State failed to prove a connection "between [the mother's] caregiving abilities or judgment and injury sustained" by Courtney.

¶ 74     We find that the mother's reliance on *A.P.* is misplaced, as that decision is factually distinguishable.    First, in *A.P.* there was no question that the injury was inflicted while the child was in the care of the respondent's boyfriend.  In contrast, in this case there were many possible perpetrators who had supervised Courtney – including the respondents, the children's 20-year-old sister, 15-year-old brother, and employees of the children's day care.  More important, unlike *A.P.*, in this case the State provided evidence that the mother failed to respond promptly to Courtney's injuries.  In *A.P.*, the supreme court emphasized that the respondent *immediately* brought her child to the emergency room as soon as she discovered the injury.  *Id.*  In contrast, the evidence in this case showed that the respondents did not take Courtney to receive medical treatment after the original fractures.  Although there was conflicting expert testimony as to whether Courtney would have exhibited noticeable signs of pain after the initial fractures, the trial court could, and apparently did, find that Dr. Glick's testimony was more credible.

¶ 75     In addition, whereas *A.P.* concerned a single injury, in this case there was evidence that the respondents did not seek timely medical attention for the second "refracture" injury. The medical records suggested that (contrary to the mother's testimony) she had been aware for approximately three days that Courtney was favoring her left arm prior to bringing her to the hospital.  Thus, we decline to find that *A.P.* precludes the findings made in this case.

¶ 76     Also relying on *A.P.*, the father's brief takes a slightly different approach to challenge the findings of abuse.  Rather than argue that the findings were against the manifest weight of the evidence, the father argues that the abuse findings should be reversed because the court

"improperly construed" the provisions of the Act regarding abuse by physical injury or "substantial risk of physical injury." 705 ILCS 405/2-3(2)(i)-(ii) (West 2012).

¶ 77    He claims that, since *A.P.* held there was no neglect if the mother lacked reason to believe her boyfriend posed a risk to the child, the trial court's failure to identify the "actual perpetrator of the abuse against Courtney" precludes any finding of abuse in this case. He urges that by proceeding to find abuse in this case, the trial court "incorrectly held that, as a matter of law, the State was never required to prove who caused Courtney's physical injuries, or created a substantial risk that she would be injured." He argues that since the trial court made findings of abuse without proof of the "perpetrator of the abuse," the trial court must have improperly interpreted section 2-3(2) "as creating an inflexible rule that proof of fault is never required."

¶ 78    The father's argument is without merit, as it confuses the issue of the *identity* of the person who injured Courtney with the broader question of whether Courtney was, in fact, abused. The father suggests that without proof of the identity of the abuser, there can be no finding of abuse. That is not the law. Section 2-3(2)(i) of the Act provides that a minor is abused if a parent "causes" or "*allows*" physical injury to be inflicted; thus, abuse may be found even if the actual perpetrator of the injury was a third party who is not a family member. (Emphasis added.) 705 ILCS 405/2-3(2)(i) (West 2012). The Act does not require a finding as to *who* committed the abuse. Our court has thus held that the "focus of an adjudicatory hearing is not whether the respondent abused the minor but rather on whether the minor was abused. [Citation.] Therefore, who committed the alleged abuse *** is of no particular consequence in an adjudicatory hearing." *R.G.*, 2012 IL App (1st) 120193, ¶ 35.

¶ 79    Moreover, contrary to the father's argument, at no point did the trial court suggest that "proof of fault is never required." Rather, as explained above, the trial court relied on evidence,

including Dr. Glick's testimony, that Courtney's injuries were nonaccidental in nature and that the respondents failed to seek timely medical attention. Thus, we reject the father's suggestion that the trial court's findings of abuse relied upon a misinterpretation of the Act.

¶ 80 Having determined that the findings of abuse were not erroneous, we turn to the findings of neglect with respect to each of Courtney and Chelsea. Both respondents urge that such findings were against the manifest weight of the evidence.

¶ 81 The trial court found the children neglected under section 2-3(1)(b) of the Act, which defines a "neglected minor" to include any minor "whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2012). "An injurious environment is an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his children." *In re Kamesha J.*, 364 Ill. App. 3d 785, 793 (2006).

¶ 82 "[C]ases involving allegations of neglect *** are *sui generis*, and must be decided on the basis of their unique circumstances." (Internal quotation marks omitted.) *A.P.*, 2012 IL 113875, ¶ 17. "On review, a trial court's finding of neglect will not be reversed unless it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 83 We address the neglect findings as to each child. First, with respect to Courtney, we find that the same evidence supporting the trial court's finding that Courtney was abused also supported the finding that she was subject to an injurious environment. Specifically, the State elicited evidence that the respondents did not seek medical attention for the original fractures to both arms, and that the respondents delayed in responding to the symptoms of the refractured left

arm.  The trial court could reasonably conclude that the respondents' failure to notice or react promptly to Courtney's symptoms demonstrated an injurious environment.

¶ 84    Similarly, the circumstances of Courtney's injury lead us to affirm the finding of neglect with respect to her sibling Chelsea under the theory of anticipatory neglect.  "The theory of anticipatory neglect flows from the concept of an 'injurious environment' which is set forth in the Act." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004).  "Under the theory of anticipatory neglect, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside *** with an individual who has been found to have neglected or abused another child.  [Citation.]  Although the neglect of one child does not conclusively show the neglect of another child, the neglect of one minor is admissible as evidence of the neglect of another minor under a parent's care. [Citation.]" *Kamesha J.*, 364 Ill. App. 3d at 793.  "[T]here is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household. [Citations.]  Rather, such neglect should be measured not only by the circumstances surrounding the sibling, but also by the care and condition of the child in question."  (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 468.

¶ 85    Although we recognize that there is no *per se* rule, we conclude that under the facts of this case, the same evidence supporting the findings of abuse and neglect for Courtney certainly supports a finding of neglect for Chelsea.  The trial court could reasonably find that, given the respondents' inability or unwillingness to recognize injuries to six-month-old Courtney, three-year-old Chelsea was at similar risk of delayed treatment should she be injured.  Moreover, as the perpetrator of Courtney's injuries was not identified—and both children shared the same caregivers—the trial court could infer that Chelsea was also at risk from the same unidentified

perpetrator. Thus, we affirm the findings of abuse and neglect with respect to both Courtney and Chelsea.

¶ 86    Apart from the findings of abuse and neglect, the mother's appellate argument additionally challenges the court's findings, after the dispositional hearing, that the respondents were unable to care for the children and that it was in the children's best interests to be adjudged wards of the court. "Under section 2-27(1) of the Act, at a dispositional hearing, the trial court must determine whether: (1) the parents were fit, willing, and able 'to care for, protect, train or discipline' their children; and (2) whether the children's health, safety, and best interests would be jeopardized if they were returned to their parents' custody." *In re Yohan K.*, 2013 IL App (1st) 123472, ¶ 150 (quoting 705 ILCS 405/2-27(1) (West 2010)). "The trial court's dispositional order will not be reversed unless it is against the manifest weight of the evidence." *Id.*

¶ 87    In this case, the court's dispositional order was based on the fact that the respondents had not yet completed certain recommended services, including the nurturing parenting program. The trial court concluded that it was in the children's best interests to remain wards of the court to allow the respondents' time to complete such services. This seems eminently reasonable.

¶ 88    The mother urges that the trial court's findings were unreasonable and conflicted with the "clear evidence of [the mother's] progress." She argues that the respondents were "generally compliant with DCFS services" and urges that she should not have been penalized by factors outside of her control, such as the unavailability of a nurturing parenting program between November 2014 and the February 2015 dispositional hearing.

¶ 89    We are not without sympathy to the mother's circumstances. It does appear that the failure to complete certain services before the dispositional hearing may have resulted, in part, from scheduling issues beyond the respondents' control. Nevertheless, keeping in mind that the

focus of the dispositional hearing was the best interests of *the children*, we cannot say that the trial court's determinations were against the manifest weight of the evidence.

¶ 90    Our court has affirmed dispositions adjudging children wards of court where parents have completed some, but not all, recommended services.  See, *e.g.*, *In re Kamesha J.*, 364 Ill. App. 3d 785, 796 (2006) (affirming dispositional order where respondent had completed some services and had made "progress in therapy, but needed more counseling").  Based on the caseworker's testimony in this case, the court could reasonably find that it was in the children's best interests that the respondents complete recommended services before regaining custody of the children.  See *id*.  ("Although respondent did participate in some recommended services, that fact does not mean that a disposition other than the one entered by the trial court would be in the best interests of the children.").  Thus, we cannot say that the trial court's dispositional findings were against the manifest weight of the evidence.

¶ 91    Finally, we address the father's separate constitutional argument that the finding of neglect with respect to Chelsea violated his substantive due process rights under the federal and Illinois constitutions.  He does not claim that the Act is facially unconstitutional, but claims that the injurious environment provision of the Act, as applied in this case, violated his due process rights because the State failed to prove that Chelsea was neglected.

¶ 92    We note that, because the father did not assert this constitutional argument in the trial court, the State and the public guardian argue that he has forfeited this contention on appeal.  We disagree, however, as "a constitutional challenge to a statute may be raised at any time and, thus, is properly considered" even if not raised in the trial court.  *People v. Campbell*, 2014 IL App (1st) 112926, ¶ 54.  However, we nonetheless find that his argument is meritless.

¶ 93    "When confronted with a claim that a statute violates constitutional guarantees of due process *** a court must first determine the nature of the right purportedly infringed by the statute.  [Citations.]"  *In re D.W.*, 214 Ill. 2d 289, 310 (2005).  Although the "rational basis" test otherwise applies, where "the constitutional right at issue is considered 'fundamental,' *** courts must subject the statute to the more rigorous requirements of strict scrutiny analysis."  *Id.*  "In order to survive strict scrutiny, the measures employed by the legislature must be necessary to serve a compelling state interest, and must be narrowly tailored thereto ***."  *Id.*

¶ 94    The Act implicates a fundamental right, since a finding of neglect can negatively impact a parent's right to raise his or her child.  See *id.* ("There is no doubt that the right of parents to control the upbringing of their children is a fundamental constitutional right.").  The father's brief recognizes that the usual test applied to such a due process challenge is whether the statute is narrowly tailored to serve a compelling state interest.  However, the father argues that this standard should not apply to his challenge to the injurious environment provision of the Act because "the statutory language is necessarily ambiguous and cannot be tailored more narrowly to serve the State's own compelling interest."  Instead, he urges that "the appropriate test in this case is whether the finding of neglect for Chelsea is so egregious that it may fairly be said to shock the contemporary conscience."

¶ 95    We decline the father's invitation to depart from precedent and adopt a new "shocks the conscience" test for such constitutional challenges.  The only two Illinois decisions cited by the father for application of a "shocks the conscious" test are inapplicable.  See *Karabetsos v. Village of Lombard*, 386 Ill. App. 3d 1020 (2008) (holding that a plaintiff bringing a cause of action against a governmental body for violation of substantive due process rights must plead governmental conduct that shocks the conscience); *People v. Ming*, 316 Ill. App. 3d 1274, 1281,

1283 (2000) (discussing whether alleged police misconduct "shock[s] our conscience" in evaluating a criminal defendant's defense of "outrageous conduct" by law enforcement).

¶ 96    Our supreme court has made clear that the applicable test for due process challenges affecting parental rights is whether the "statute at issue [is] necessary to serve a compelling state interest" and is "narrowly tailored."  *D.W.*, 214 Ill. 2d at 311.  We will not depart from that precedent here.  As the father's appellate briefing does not even attempt to argue that the Act fails to satisfy this well-settled standard, his constitutional challenge fails.

¶ 97    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 98    Affirmed.