2020 IL App (1st) 191981-U

FIRST DISTRICT,
SECOND DIVISION
March 3, 2020

No. 1-19-1981

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| In re the Interest of A.M. and J.E. | ) | Appeal from the |
| | ) | Circuit Court of |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 18 JA 964 |
| v. | ) | and 18 JA 965 |
| | ) | |
| L.M., | ) | Honorable |
| | ) | Demetrios G. Kottaras, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:   At adjudication of wardship proceeding, trial court's finding of anticipatory neglect as to 11-year-old child was not against the manifest weight of the evidence where 4-month-old sibling sustained severe injuries from an unknown perpetrator and the siblings shared most of their caregivers in common.

¶ 2    On September 15, 2018, four-month-old J.E. was brought to the hospital with head, eye, and liver injuries that medical staff attributed to abuse.  The State filed a petition for adjudication of wardship over J.E. and his 11-year-old sister A.M., although there was no allegation of injury

to A.M. Following an adjudication hearing, the trial court found that J.E. was physically abused and that both J.E. and A.M. were neglected due to an injurious environment and abused due to a substantial risk of physical injury. The court later entered a dispositional order making J.E. and A.M. wards of the court.

¶ 3    The mother of the children, Ladonna M., now appeals, challenging A.M.'s adjudication order, which, if reversed, would void the dispositional order. She does not challenge the court's orders as to J.E. For the reasons that follow, we affirm.

¶ 4                                    BACKGROUND

¶ 5    In September 2018, Ladonna lived with her three minor children: 11-year-old A.M., 7-year-old R.M., and 4-month-old J.E. The fathers of the children did not reside in the household and did not participate in the underlying proceedings.

¶ 6    On September 15, 2018, at around 10 p.m., Ladonna brought J.E. to the emergency room of the University of Chicago Hospital with symptoms of lethargy, irritability, and vomiting. Tests showed that J.E. had an unstable heart rate and elevated liver enzymes. An MRI scan of his head revealed multiple subdural hematomas (*i.e.*, internal bleeding), and a retinal exam revealed extensive retinal hemorrhaging in both eyes.

¶ 7    Per hospital policy, whenever a child under the age of two is admitted with an injury, the hospital's child advocacy team is consulted regarding the possibility of abuse. On September 17, J.E. was examined by Dr. Jill Glick, the medical director of the child advocacy team. Dr. Glick diagnosed J.E. with abusive head trauma, likely caused by shaking. She opined that J.E.'s subdural hematomas indicated more than one incident of injury, because one was acute (within 72 hours) while the others were chronic (more than 5 to 10 days prior). She also opined that

J.E.'s elevated liver enzymes were caused by blunt trauma to the belly area, such as a punch or a kick.

¶ 8        On September 26, 2018, the State filed petitions for adjudication of wardship over J.E. and A.M.  Regarding A.M., the State alleged that she was (1) neglected because her environment was injurious to her welfare and (2) abused because she was subject to a substantial risk of physical injury from a family member or someone else responsible for her welfare.  These allegations were based solely on J.E.'s injuries.

¶ 9        The case proceeded to an adjudication hearing.  Ladonna testified[1] that she never shook J.E. or hit him in the head, but she acknowledged that J.E. had multiple other caretakers.  While Ladonna was at work, she would leave her children in the care of her sister, her mother, or her two adult children who lived with her mother.  Typically, her sister took care of J.E. while her mother took care of A.M. and R.M.  She had never seen her sister or her mother acting violently or inappropriately toward her children, and she never observed any marks or bruises on her children after her sister or mother babysat them.

¶ 10        Ladonna also asked J.E.'s father Jonathan to take care of him twice in the two-week period before J.E.'s hospitalization.  Ladonna acknowledged having physical altercations with Jonathan[2], but she said: "I never would think that he'll hurt the baby, you know?"  Jonathan's contact with J.E. was infrequent: Ladonna said that Jonathan took care of J.E. "more than twice, more than four or five times" that she could recall, while Jonathan told a DCFS investigator that he could "count on one hand" the number of times he had seen J.E.  Ladonna additionally

_____

[1] In addition to Ladonna giving live testimony, the parties also stipulated to the testimony of a DCFS investigator and a caseworker who obtained statements from Ladonna.
[2] In fact, Ladonna had an order of protection against Jonathan at the time of the adjudication hearing, though she did not have one at the time of J.E.'s hospitalization.

testified that "[the] only reason that he'll come around is for his son's sake. Not my other kids, that's not his kids."

¶ 11        Ladonna then testified about the events leading up to J.E.'s hospitalization. On the night of September 14, 2018, J.E. slept through the entire night, which was unusual for him. The next morning, when Ladonna woke him up, he was vomiting "a little bit," and although he was playing normally, Ladonna thought he looked "sickly." Ladonna brought him to her sister's house and then went to work. When she picked him up, J.E. "didn't look good at all": he appeared fatigued and limp, and Ladonna suspected he was dehydrated from excessive vomiting. As soon as she saw his condition, she "rushed him to the hospital." [3]

¶ 12        After the extent of J.E.'s injuries became known, Ladonna reported to the hospital two incidents in the prior week that she thought might explain his injuries. In the first incident, Ladonna was transferring him between car seats when she accidentally bumped his head on the car door. In the second, J.E. rolled off A.M.'s bed, which was two or three feet high, and hit the hardwood floor below.

¶ 13        Both sides presented expert testimony regarding the likely cause of J.E.'s injuries. The State called Dr. Glick, who, as noted, diagnosed J.E. with abusive head trauma. She opined that J.E.'s head injuries were not caused by hitting his head on a car door or falling off a bed, because she found no evidence of external injury, such as swelling or a skull fracture. She also opined

---

[3] Ladonna was unclear about the exact timeline of events on September 15. Initially, she testified that she worked at Jewel from 10 a.m. to 1 p.m., ran some errands, picked J.E. up around 3 p.m., and then brought him directly to the hospital. Counsel for the State pointed out that J.E. did not arrive at the emergency room until 10 p.m. Ladonna said she did not recall exact times since "[i]t was months ago," and she speculated she might have gone back to work before picking up J.E. She had a part-time job at Metra where she worked "varied shifts," including a 4 p.m. to 8 p.m. shift.

that J.E.'s liver injury was not caused by falling off a bed, since infants have large ribcages that protect them from fall damage.

¶ 14    The State also called Dr. Hassan Shah, a pediatric ophthalmologist who examined J.E. on September 16, 2018. Dr. Shah stated that J.E. had extensive hemorrhages in multiple layers of both eyes. The most common cause of such injury in an otherwise healthy child is abusive head trauma. Other potential causes, such as a bleeding disorder, blood cancer, and infection, were ruled out by lab tests. Dr. Shah stated it was "extremely unlikely" that J.E.'s eye injuries resulted from hitting his head on a car door. The injuries could have resulted from a fall from multiple stories, but not from a bed two or three feet high.

¶ 15    Ladonna called Dr. Joseph Scheller, a pediatric neurologist who reviewed J.E.'s medical records and found no evidence of abuse. Instead, he opined that J.E. suffered a "minor head trauma with a preexisting condition." He explained that the MRI scan of J.E.'s head showed a collection of thick fluid inside the skull and outside the brain. This condition, called a subdural hygroma, takes "weeks or months" to develop, and it stretches the blood vessels that bridge the inside of the skull and the surface of the brain. Because the blood vessels are under tension, "any small trauma" to the head can cause a subdural hematoma. Dr. Scheller found evidence of such trauma in J.E.'s CT scan, which reflected blood and swelling on the back of the scalp. He theorized that the fall or other injury that caused J.E.'s subdural hematoma could have also caused his liver injury.

¶ 16    Helena Townsend, a child protection investigator for DCFS, visited Ladonna's home on September 18, 2018. The home was orderly and clean, and Ladonna cooperated with the safety plans for J.E. and his siblings. Townsend conducted a body check of A.M. and did not observe any injuries. A.M. told Townsend that she was not afraid of anyone in the home, and she denied

seeing anyone hit, drop, or shake J.E. R.M. likewise said that he was not afraid of anyone in the home.

¶ 17    At the conclusion of the adjudication hearing, the trial court found that the State's experts were more credible than Dr. Scheller as to the cause of J.E.'s injuries, because Dr. Scheller lacked a convincing explanation for J.E.'s liver trauma. The court found that J.E. was physically abused but declined to enter a finding as to the perpetrator. It also found that both J.E. and A.M. were neglected due to an injurious environment and abused due to a substantial risk of physical injury. The court did not explain the basis of its findings regarding A.M.

¶ 18    Following a dispositional hearing on August 30, 2019, the court made A.M. and J.E. wards of the court and appointed a guardian for them. The court found that Ladonna was unable to take care of the children and the children's fathers were unable, unwilling, and unfit. The court set permanency goals for J.E. to return home in 12 months and for A.M. to return home in 5 months "because [A.M.] is a big girl. The concerns aren't there that would be for [J.E.] given [J.E.]'s age."

¶ 19                                ANALYSIS

¶ 20    In this appeal, Ladonna challenges the court's adjudication order as to A.M., which, if reversed, would render void the court's dispositional order. Ladonna argues that the court erred in finding A.M. abused and neglected, since there was no evidence that A.M. sustained harm, her circumstances did not put her at risk, and she was not similarly situated to her infant sibling.

¶ 21    A proceeding for adjudication of wardship represents "a significant intrusion into the sanctity of the family which should not be undertaken lightly." (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 18. Thus, the State bears the burden of proving its allegations of abuse and neglect by a preponderance of the evidence. *In re Arthur H.*, 212 Ill. 2d

441, 463-64 (2004).  We will not reverse the trial court's findings unless they are against the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident.  *A.P.*, 2012 IL 113875, ¶ 17.

¶ 22 As relevant to this appeal, a minor is abused if any person responsible for her welfare creates "a substantial risk of physical injury" to her, and she is neglected if her "environment is injurious to *** her welfare."  705 ILCS 405/2–3(1)(b), (2)(ii) (West 2016).  Because there was no evidence that A.M. suffered any injury, the State's abuse and neglect allegations were anticipatory in nature.  "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child."  *Arthur H.*, 212 Ill. 2d at 468; see *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 39 (although child was healthy and had not yet been injured or harmed, "our courts have made clear that we need not wait until a child becomes a victim of physical abuse or permanent emotional damage before such a finding [of anticipatory neglect] may be upheld").  Although abuse or neglect of a child is admissible as to siblings under the care of respondent (705 ILCS 405/2-18(3) (West 2018)), it does not constitute *per se* proof that the siblings are also abused or neglected; each case must be reviewed on its own facts.  *Arthur H.*, 212 Ill. 2d at 468-69; *In re Edricka C.*, 276 Ill. App. 3d 18, 31 (1995).

¶ 23 Here, the court did not enter any findings as to who abused J.E., but the record reflects several possible perpetrators: J.E.'s father Jonathan, Ladonna's sister, Ladonna's mother, Ladonna's two adult children, and Ladonna herself.  As to Jonathan, there is no evidence that he ever interacted with A.M.; Ladonna testified that "[the] only reason that he'll come around is for his son's sake."  But J.E. shared all his other caregivers with A.M.  Under these circumstances, it

was not against the manifest weight of the evidence for the trial court to find that A.M. was subjected to an injurious environment and a substantial risk of physical injury.

¶ 24     In this regard, this case is analogous to *In re Chelsea H.*, 2016 IL App (1st) 150560, in which six-month-old Courtney was brought to the hospital with fractures in both arms that medical staff attributed to abuse. Courtney's caretakers were her parents, her older siblings aged 15 and 20, and daycare personnel. Following an adjudication hearing, the trial court found that Courtney's injuries were nonaccidental, though it did not enter any finding as to the perpetrator. The court entered findings of abuse as to Courtney and anticipatory neglect as to her three-year-old sister Chelsea. *Id.* ¶ 41. We affirmed, stating: "[A]s the perpetrator of Courtney's injuries was not identified—and both children shared the same caregivers—the trial court could infer that Chelsea was also at risk from the same unidentified perpetrator." *Id.* ¶ 85. Likewise, in this case, the trial court could infer that A.M. was more likely than not at risk from the unidentified perpetrator who inflicted serious injuries on her younger brother.

¶ 25     Ladonna argues that since A.M. is 11 years old (now 13), she is not at risk of the same injuries that befell J.E. Specifically, "[s]he is not susceptible to being shaken, if that is what someone did to J.E." But Dr. Glick testified that J.E.'s liver injuries likely came from a blow to the midsection, such as a punch or a kick, to which A.M. certainly would be susceptible.

¶ 26     Ladonna also points out that, in the 11 years A.M. spent in her mother's home, there is no evidence she suffered any harm. On the contrary, the uncontradicted testimony is that she was thriving: Ladonna described her as bright, outgoing, and "a perfect honor roll student," and A.M. herself stated that she was not afraid of anyone in her home. We are not unsympathetic to this argument, especially because the only caretaker she did not share with J.E. (*i.e.*, Jonathan) is the only one with a known propensity for violence. For this reason we are troubled by the trial

court's ruling. But on this record, where so little is known about the circumstances of J.E.'s injury, we cannot say the trial court's abundance of caution is against the manifest weight of the evidence.

¶ 27 Finally, Ladonna argues that the trial court misapprehended the law and applied a *per se* rule of anticipatory neglect, contrary to the well-established principle that each case must be decided on its own facts (*Arthur H.*, 212 Ill. 2d at 468-69). We do not find any such misapprehension by the trial court. When issuing its adjudicatory findings, the trial court distinguished *In re Zion M.*, 2015 IL App (1st) 151119, on its facts. In *Zion M.*, the State argued that Zion was neglected under a theory of anticipatory neglect, based on neglect of Zion's siblings that occurred two months before Zion was born. The perpetrator of the neglect was respondent's boyfriend, who was incarcerated prior to Zion's birth. Under these facts, the *Zion M.* court affirmed the trial court's finding of no anticipatory neglect. *Id.* ¶¶ 34-35. Here, the trial court correctly found *Zion M.* inapposite but did not purport to articulate a *per se* rule of anticipatory neglect for children born before an incident of abuse and neglect occurs.

¶ 28 CONCLUSION

¶ 29 For the foregoing reasons, the trial court's adjudication order as to A.M. was not against the manifest weight of the evidence.

¶ 30 Affirmed.