2020 IL App (1st) 192081-U

THIRD DIVISION
June 3, 2020

No. 1-19-2081

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.H., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 JA 351 |
| | ) | |
| Jamica H., | ) | Honorable |
| | ) | Andrea M. Buford, |
| Respondent-Appellee). | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County is affirmed; the State failed to prove the minor was abused or neglected based on the doctrine of anticipatory neglect by a preponderance of the evidence where the stipulated evidence failed to establish any history of abuse or neglect, harm, or risk of future harm to the minor from the abuse of his sibling.

¶ 2    J.H.'s infant sibling was physically abused resulting in serious injury.  The State filed a petition of wardship in favor of J.H., a minor, and his sibling based on those injuries.  The injuries were inflicted on J.H.'s sibling by their mother's paramour Malcolm Howard who at the time erroneously believed he was the sibling's father.  The trial court found J.H.'s sibling, who is

not a party to this appeal, abused and neglected. The trial court found the State failed to prove the minor at issue in this appeal was abused or neglected. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4    On April 13, 2018, the State filed a petition for adjudication of wardship of J.H., born February 15, 2016 (petition). The petition alleged J.H. was abused pursuant to section 2-3(2)(ii) of the Juvenile Court Act (Act) (705 ILCS 405/2-3(2)(ii) (West 2018)) because his parent or a paramour of his parent creates a substantial risk of physical injury to the minor by other than accidental means and neglected pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2018)) due to an injurious environment. The petition alleged the same facts in support of both allegations and stated as follows:

>    "On March 29, 2018 [J.H.'s sibling] was observed to have bruising about his body. [J.H.'s sibling] was transported to the hospital in critical condition and diagnosed with multiple injuries. [J.H.'s sibling] has been diagnosed with a skull fracture, collapsed lungs, crushed trachea and multiple internal injuries including a lacerated kidney. Per medical personnel [J.H.'s sibling's] injuries are life-threatening, inflicted and indicative of physical abuse. [Jamica H. (J.H.'s mother)] states that [J.H.'s sibling's] putative father threw [J.H.'s sibling] against a wall, choked and punched [J.H.'s sibling] in the face. [Jamica H.] admits she delayed seeking medical attention for [J.H.'s sibling.] [J.H.'s] [p]utative father's whereabouts are unknown. Paternity has not been established."

¶ 5    On April 13, 2018, the trial court entered an order finding that probable cause existed that J.H. is abused and neglected and placed J.H. in temporary custody. On July 19, 2019, the trial court held an adjudicatory hearing by stipulation between the parties. The parties prepared a

written stipulation of facts and also stipulated to the admission of medical records from J.H.'s sibling's admission to the hospital. The parties read the stipulation of facts into the record and the State published portions of the medical records at the adjudicatory hearing.

¶ 6 The parties stipulated to the following facts pertinent to this appeal: Jamica identified a putative father for J.H. but he never came to court, and on April 8, 2019, the trial court entered a default judgment against J.H.'s putative father. Louis Jenkins would testify that he is a child protection investigator for the Illinois Department of Children and Family Services (DCFS), and on March 29, 2018, DCFS assigned him to investigate this matter. Jenkins visited J.H.'s sibling at the hospital. Jenkins spoke to J.H.'s mother Jamica at the hospital. Jamica told Jenkins that her roommate William told her that William saw Malcolm choke and punch J.H.'s sibling. The sibling seemed fine to Jamica. Jenkins would testify that Jamica told him that the "next morning" she noticed the sibling throwing up mucus and blood when Jamica was trying to feed him and that she called an ambulance to take the sibling to the hospital. The next day, Jenkins observed J.H. J.H. was well-groomed and alert, oriented, and his mood and affect were within normal limits. Jenkins would describe J.H. as talkative and friendly, and Jenkins did not observe any visible or obvious signs of abuse or neglect on J.H.

¶ 7 Dr. Trent Hubbard would testify he interviewed Jamica on March 30, 2018. According to Dr. Hubbard, Jamica told him she took J.H. to Head Start on March 29, 2018, leaving J.H.'s sibling with Malcolm. Everything was fine at that time and when Jamica returned. Sometime later, Jamica and Malcolm's cousin, Javonda, went to the hospital for themselves, leaving J.H.'s sibling and Javonda's two children with Malcolm. Dr. Hubbard would testify that Jamica told him they returned home around 4:30 p.m., with J.H., who they picked up from school. Jamica checked on J.H.'s sibling and saw no issues. Specifically, Jamica "changed [J.H.;s sibling's]

pamper and checked his body. [The sibling] awoke and started crying [and Jamica] burped him, and he started to laugh and smile." Jamica and Javonda left again to return to the hospital because they had not been seen earlier. Dr. Hubbard would testify that Jamica told him she called home to check in around 6:00 p.m. and Malcolm reported everything was alright. Jamica and Javonda returned home at approximately 9:10 p.m. Jamica checked on the kids and found both asleep in bed. Around that same time, according to Dr. Hubbard's account of what Jamica told him, Jamica's roommate said to Jamica: "Tell me why I've seen your baby daddy choking your son up to the wall, body-slamming him to into the bed and punching him in the face?" Jamica told Dr. Hubbard she was initially in shock. Jamica went to check on the kids. According to Dr. Hubbard the time was approximately 10:30 p.m. Jamica noted scratches on J.H.'s sibling's face "that were there previously from his nails." The sibling's arms and legs appeared fine. The sibling woke up and was smiling and laughing. Jamica told Dr. Hubbard everything seemed fine at that time. Jamica did not think it was necessary to call 9-1-1 at that time because the crying she heard from J.H.'s sibling earlier that day was not the same type of crying she had heard from the sibling before, when the sibling was in pain from being circumcised. Jamica told Dr. Hubbard J.H.'s sibling slept through the night.

¶ 8    Dr. Hubbard would testify that Jamica told him that J.H.'s sibling awoke between 5 and 5:30 a.m. and Javonda took him so Jamica could sleep. J.H. woke up around 7:00 a.m. When Jamica awoke J.H.'s sibling was laughing and playing with Javonda. Javonda did not report anything wrong. Jamica checked on Javonda and J.H.'s sibling again at approximately 10:00 a.m. and "everything was good." Malcolm, who had left sometime the night before, returned to the home around noon. Jamica allowed Malcom to take J.H. and J.H.'s sibling into his and Jamica's bedroom for a nap at approximately 1:00 p.m. Malcolm, J.H., and J.H.'s sibling

napped in the bedroom from approximately 1:00 p.m. until 3:00 p.m. while Jamica cleaned the house. At 3, J.H.'s sibling woke up crying. Dr. Hubbard would testify that Jamica told Dr. Hubbard that at approximately 3:00 p.m. on March 29, she went to check on J.H.'s sibling and attempted to feed him, but "he was crying and wouldn't take the bottle." Jamica "then noticed blood mixed with drool coming from the child's mouth." Malcolm denied doing anything to J.H.'s sibling. Javonda entered the bedroom and told Jamica that Javonda planned to take her own children to her mother's house and that Jamica should bring J.H.'s sibling with her and then they would all go to the hospital. Dr. Hubbard would testify that "[a]t this time, [Jamica] could not recall the specific times that each event occurred." When Jamica and Javonda arrived at Javonda's mother's house, she told them J.H.'s sibling needed to go to the hospital and they should call 9-1-1, which they did. The stipulation states as follows:

> "[Jamica] was asked by Dr. Hubbard if she noticed any bruising and she said yes. She told Dr. Hubbard she noticed what appeared to be greenish-purple marks on both his cheeks and his chin as if someone had grabbed his face. She also reported noticing a conjunctival hemorrhage in [J.H.'s sibling's] left eye. She said she first noticed the bruising and eye finding the morning of March 29, 2018."

Dr. Hubbard would testify to J.H.'s sibling's injuries, that those injuries were life threatening, and that the injuries were the result of inflicted injury indicative of child abuse. He would also testify that J.H. was evaluated in the emergency room and had "no patterned marks and his skeletal survey was unremarkable." J.H. was discharged.

¶ 9    According to the stipulation, Jamica would herself testify that she had no reason to suspect that Malcolm would hurt J.H.'s sibling. Jamica went to check on J.H.'s sibling after her

roommate told her what happened and J.H.'s sibling was asleep and seemed fine. Jamica would testify that "[i]t wasn't until the next day when she noticed that [J.H.'s sibling] was spitting up blood and mucus." Jamica would testify that she asked Javonda for a ride to the hospital but Javonda had to drop off her own children at her mother's house first. As soon as they arrived at Javonda's mother's house they called 9-1-1.

¶ 10    The parties stipulated to the admission of J.H.'s sibling's medical records from the hospital and Child Protective Services. The records contain an "initial consult note" for Child Protective Services written by Dr. Hubbard. The initial consult note states that J.H.'s sibling "is a 4 month old male presenting with altered mental status and facial bruising." The note is consistent with Dr. Hubbard's stipulated testimony except that it adds, in pertinent part, that when Jamica told Dr. Hubbard she could not remember specific times that each event occurred, Jamica said, "I didn't check the clock, I was so worried;" and that, on the way to Javonda's mother's house, they called Javonda's mother and told her what happened, then Javonda's mother met them outside. The records indicate that upon initial exam J.H.'s sibling had "ecchymoses to the right frontal bone and an abrasion on his back," among other observations. The note later states that J.H.'s sibling "was initially noted to have facial bruising, an abrasion to his back and a conjunctival hemorrhage in his left eye as reported by his mother. He was also found to have an abrasion and swelling of his left upper eyelid." The note states that J.H.'s sibling had "[r]eddish purple discoloration on the lateral aspect of the face just anterior to the left ear, cleaned with an alcohol swab and remained. Scattered bluish marks also noted overlying the left mandible." The note states that J.H.'s sibling's "low weight and lack of regular medical care is concerning for medical neglect."

¶ 11    Dr. Torres added a note to the medical records.  Dr. Torres's note states that Dr. Torres spoke to Jamica separately and privately and examined J.H.'s sibling.  Dr. Torres added that Jamica stated to Dr. Torres that J.H.'s sibling "was well and acting like his normal self until the day of admission."  On the day of admission, that morning, Jamica "noticed what looked like greenish purple bruising on both sides of his face and chin 'like someone had grabbed him' ([Jamica] demonstrated a hand grabbing him around his chin and face)."  Dr. Torres wrote that Jamica "also noticed a red mark on the white part of his left eye that she had not noticed previously."  Around 2:30 or 3:00 p.m. Jamica tried feeding J.H.'s sibling but he was crying as the bottle was in his mouth.  Jamica told Dr. Torres she sat J.H.'s sibling up and "he looked groggy and kind of out of it, that is when [Jamica] noticed he had blood tinged mucous coming from his mouth."  J.H.'s sibling was crying but "his cry sounded different like he was 'strangling' so [she] took a bulb syringe to his mouth and a large amount of mucous and blood (more blood that mucous) came out of his mouth."  Dr. Torres's note also states that Javonda's mother asked Jamica about the bruising to J.H.'s sibling's face.

¶ 12    Although Jamica reported to Dr. Torres and others that she and Javonda left their house at approximately 3:00 or 3:30 p.m., Dr. Torres's note states that EMS records state they were at the scene at 1:29 p.m.  The medical records [prepared by Dr. Torres] state that Jamica told the Chicago Fire Department the following:  " 'last night the child's father was caring for the patient when the baby wouldn't stop crying the father became enraged and shook the baby violently, the night after the father picked up the patient [(J.H.'s sibling)] and slammed the patient against a wall holding the patient against the wall by the patient's throat.' "  The EMS records further state that EMS noted bruising to the face but no bloody oral secretions.  Dr. Torres wrote that he was present with Dr. Hubbard when J.H.'s sibling was examined and their examination was limited

due to medical devices but J.H.'s sibling did "appear to have bruising to the left side of his face *** as well as an abrasion and bruising to the left eye and a left subconjunctival hemorrhage." The Child Protective Services consult note concludes, in part, that J.H.'s sibling "presented with altered mental status, facial bruising and blood tinged oral secretions ***. His initial medical evaluation was significant for facial bruising, a left subconjunctival hemorrhage, and abrasion to his back, a right parietal bone fracture with overlying scalp hematoma, subcutaneous emphysema of the neck and a pneumomediastinum."

¶ 13    The records contain a "Child Family Wellness Consultation Summary" Dr. Hubbard authored that states, in part, that a repeat examination of J.H.'s sibling on April 11, 2018 "revealed resolution of the facial bruising noted to his left upper eyelid, inferior to his left eye, to his left lateral face and chin and left mandible. His bilateral conjunctiva were noted to be clear with resolution of the left subconjunctival hemorrhage [seen] on initial exam." The "Past Medical History" section of the summary states that J.H.'s sibling was seen by a doctor at 6 days and 2 weeks of age for routine well visits, and "at the 6 day old visit [J.H.'s sibling] had bilateral medial subconjunctival hemorrhages that were noted to be resolving at the 2 week visit." Dr. Hubbard's summary concludes "[t]here was also a significant delay in seeking medical care after [J.H.'s sibling's] mother was notified of [J.H.'s sibling's] trauma. Left untreated, [his] injuries would have been fatal and the delay in his care contributed to the critical nature of his medical condition upon arrival to the hospital and is indicative of medical neglect."

¶ 14    According to a record dated June 21, 2018, Jamica was "enrolled in parenting classes as well as therapy." J.H. and J.H.'s sibling were living with their maternal grandmother since the sibling was discharged from the hospital. A December 5, 2018 record states that Jamica was visiting them every day at that time.

¶ 15    Following the hearing the trial court found that J.H.'s sibling was abused and neglected and dismissed the petition for adjudication of warship as to J.H. on the grounds of abuse due to a substantial risk of physical injury and neglect due to an injurious environment.  The court stayed its order pending a motion to reconsider the court's ruling.  The State and the minors, through the Public Guardian as their guardian *ad litem* (GAL), filed a motion to reconsider.  Following briefing of the motion and a hearing the trial court denied the motion.  The court stated: "I stand by my original ruling finding [J.H.] was not neglected due to an injurious environment and not abused due to a substantial risk of physical injury and deny the motion to reconsider."  The GAL asked the court to maintain its stay of its order as to J.H. and the trial court initially denied the stay.  The GAL made an offer of proof as follows:

>   "I have the agency before you today.  We have a parenting capacity assessment and several assessments of mother that states she cannot parent.  The agency at this time feels that it would be unsafe for [J.H.] to return to his mother's care.  Additionally, mother's not present today.  According to the agency, not only are her whereabouts unknown to the agency, but she hasn't been in contact with the agency."

¶ 16    Following the offer of proof the trial court granted the stay over defendant's objection.

¶ 17    This appeal followed.

¶ 18                                    ANALYSIS

¶ 19    The Act defines an abused child, in pertinent part, as:

>   "any minor under 18 years of age *** whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same

home as the minor, or a paramour of the minor's parent: *** (ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2018).

The Act, as it relates to this appeal, defines a neglected minor as "any minor under 18 years of age *** who is not receiving the proper *** medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being." 705 ILCS 405/2-3(1)(a) (West 2018).

"Generally, 'neglect' is defined as the ' "failure to exercise the care that circumstances justly demand." ' [Citations.] However, this does not mean that the term 'neglect' is limited to a narrow definition; to the contrary, 'neglect,' by necessity, has a fluid meaning. As this court has previously explained,

' "[Neglect] embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." ' [Citations.]

Similarly, the term 'injurious environment' has been recognized by our courts as an amorphous concept that cannot be defined with particularity. [Citations.] In general, however, the term 'injurious environment' has been interpreted to include 'the breach of a parent's duty to ensure a "safe and

nurturing shelter' for his or her children." ' [Citations.]" *In re Arthur H.*, 212 Ill.

2d 441, 463 (2004).

¶ 20    "It is the State's burden to prove the neglect and abuse allegations by a preponderance of

the evidence, establishing the allegations of neglect or abuse are more probably true than not."

*In re J.V.*, 2018 IL App (1st) 171766, ¶ 225.  On review of a trial court's ruling regarding abuse

or neglect of a minor, the trial court's ruling typically "will not be disturbed unless it is against

the manifest weight of the evidence." *Interest of Davion R.*, 2019 IL App (1st) 170426, ¶ 78.

Under this standard, "the reviewing court must give deference to the trial court's findings of fact

as the trial court is [usually] in the best position to observe the conduct and demeanor of the

parties and witnesses, assess their credibility, and weigh the evidence." *Id.*  However, in this

case the trial court's ruling "was based upon a stipulated record and not based upon any

observations of the witnesses or witnesses' testimony." *In re Zion M.*, 2015 IL App (1st)

151119, ¶ 28.  "As such, the trial court was not in a better position than the reviewing court to

assess credibility or weigh the evidence.  Therefore, since we are in the same position as the trial

court, the trial court is not vested with wide discretion, and our review is *de novo*." *Id.*

¶ 21    In this appeal the GAL argues the trial court failed to properly apply Illinois law

regarding anticipatory neglect and should have found J.H. abused due to a substantial risk of

physical injury and neglected due to an injurious environment based on living in the same home

with his sibling who was physically abused and neglected due to lack of care.

>           "Under the anticipatory neglect theory, the State seeks to protect not only
>
>           children who are the direct victims of neglect or abuse, but also those who have a
>
>           probability to be subject to neglect or abuse because they reside, or in the future
>
>           may reside, with an individual who has been found to have neglected or abused

another child. [Citation.] Although the neglect of one child does not conclusively show the neglect of another child, the neglect of one minor is admissible as evidence of the neglect of another minor under a respondent's care. [Citation.] Under the theory of anticipatory neglect, where there is evidence of prior neglect by the parents, the trial court should not be deterred from acting until another child is injured." (Internal quotation marks omitted.) *In re J.V.*, 2018 IL App (1st) 171766, ¶ 228.

"[O]ur supreme court has cautioned that 'the mere admissibility of evidence does not constitute conclusive proof of the neglect of another minor' ([citation])." *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 53.

"Cases pursued under a theory of anticipatory neglect, like any other cases concerning the adjudication of minors, must be reviewed on their own facts and must take into consideration not just the circumstances relating to the minor's siblings, but also 'the care and condition of the child in question.' [Citation.]" *Id.*

"To determine whether a finding of anticipatory neglect is appropriate, the trial court should consider the current care and condition of the child in question and not merely the circumstances that existed at the time of the incident involving the child's sibling." (Internal quotation marks and citations omitted.) *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 44. "[T]here is no *per se* rule that neglect or abuse of one child conclusively establishes, or does not establish, the neglect of another child—it amounts only to admissible evidence. [Citation.] Accordingly, as with any neglect or abuse finding, *** findings made under this doctrine should be measured not only by the circumstances surrounding the sibling, but also by the care and condition of the child in question." (Internal quotation marks omitted.) *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 34.

¶ 22    The GAL asserts that Jamica's "serious medical neglect of J.H.'s sibling [surrounding his injuries on March 28 and 29, 2018] and her evasiveness and conflicting accounts of events show a clear risk to [J.H.]"  Specifically, the GAL argues that Jamica gave "multiple inconsistent versions of events" that were evasive and that her "failure to seek immediate medical attention supports findings of" neglect due to an injurious environment and abuse due to a substantial risk of serious injury as to J.H.  The GAL argues there are numerous inconsistencies both within Jamica's multiple statements regarding the events of March 28 and 29, 2018 and between Jamica's statements and the medical records.  The GAL asserts it "is reasonable to infer *** that Jamica was more concerned about her children being removed from her by DCFS than with [J.H.'s sibling's] life-threatening injuries" and claims J.H. likely witnessed his brother's abuse.

¶ 23    Initially we note that the same evidence can be used to support a finding of both abuse and neglect.  See, *e.g.*, *In Interest of M.K.*, 271 Ill. App. 3d 820, 826 (1995) ("an injurious environment or substantial risk of harm is sufficient for a finding of neglect and abuse").  In support of its "evasiveness" and "misleading" argument, which the GAL asks this court to presume was "designed to minimize her unwillingness to protect [J.H.'s sibling] and seek the timely medical attention [he] needed," the GAL relies in part on this court's decision in *In re Adam B.*, 2016 IL App (1st) 152037, in which we did find anticipatory neglect of a sibling of the victims of abuse and neglect.  See *In re Adam B.*, 2016 IL App (1st) 152037, ¶ 49.  The GAL's argument to this court implies we found such anticipatory neglect because "the mother was evasive and gave conflicting versions of how [the child's] burns occurred, when [the mother] first noticed the burns, and when she first sought medical treatment," which the GAL argues is similar to Jamica's behavior with authorities in this case.  Neither assertion is accurate.

¶ 24   In *Adam B.*, the trial court found three siblings abused and neglected, and only the oldest child was found abused and neglected under the theory of anticipatory neglect. *Id.* ¶¶ 40, 44, 49. The trial court found the first child, Joshua, abused and neglected due to "untreated medical health issues" and his mother's "failure to follow-up with Joshua's mental health needs." *Id*. ¶ 39. The trial court found the second child, Isiah, abused and neglected due to the mother's inability to "protect Isaiah from Joshua's aggression," an "inexplicable second degree burn" to Isaiah's leg, and his mother's "failure to get Isaiah to the hospital promptly for treatment." *Id*. ¶ 44. Finally, the *Adam B.* court held that the mother's "failure to get immediate medical help for Isaiah's second degree burn and [her] failure to follow-up with the medical staff's recommendation for Joshua's mental health needs created [an] injurious environment for Adam." *Id*. ¶ 49. The court rejected the mother's argument the trial court improperly applied the doctrine of anticipatory neglect. See *id.* ¶ 46. The court held the mother in *Adam B.* was "noncompliant with services" and noncooperative with DCFS over several months (see *id.* ¶¶ 4, 51-52); she "failed to ensure that Joshua received the proper counseling for his mental health needs," which manifested in violence toward his siblings (see *id.* ¶¶ 38, 51); and failed to assist DCFS in procuring medical care for the children, including having left the emergency room before Isaiah's treatment was completed (see *id.* ¶¶ 21, 52).

¶ 25   First, this court noted the evasiveness and conflicting accounts of the mother in *Adam B.* regarding one of the children who suffered direct abuse and neglect in that case and not the minor who was found abused and neglected under the doctrine of anticipatory neglect. See *id.* ¶¶ 43, 46-49. This court wrote:

> "Moreover, the record indicates that Alma B. was evasive and gave
>
> conflicting versions of how and when Isaiah's burn occurred. Specifically, Alma

B. told the DCFS investigator that Isaiah was burned on a space heater at the Kedvale address, but she did not allow the investigator into that address to see the instrument that reportedly caused the burn. Later, during an interview with a Lurie social worker, she stated that she does not know how Isaiah's burn occurred. Additionally, she told the intake medical staff at Lurie that she brought Isaiah to Lurie as soon as she noticed the bruise. However, Alma B. told Lurie's social worker that she noticed the 'bruise' five days prior and that she did not know how Isaiah got it. These actions raised the medical staff's suspicions for burns by neglect and DCFS and the police were contacted." *Id.* ¶ 43.

¶ 26    Second, the mother's evasiveness and conflicting versions in that case were additional evidence of abuse and neglect and not the basis of this court's holding. See *id.* ¶ 42-44. Finally, although the GAL asserts "Jamica's multiple inconsistent versions of events were just as evasive as the parent's explanations in *Adam B.*, if not more so," we disagree; and, as discussed further below, we do not find that any inconsistencies in the entire record of Jamica's accounts to authorities about J.H.'s sibling in this case are of a similar character to the mother's evasive and conflicting account in *Adam B.* See *infra*, ¶¶ 27-31.

¶ 27    Regarding the inconsistencies in Jamica's recitations of the events of March 28 and 29, 2018, the inconsistencies asserted by the GAL primarily go to the general timeframe for when Jamica discovered or recognized that J.H.'s sibling was injured, the specific times for when Jamica took J.H.'s sibling to the emergency room or returned home from taking herself to the hospital, and speculation about what Jamica or J.H. heard or observed. The GAL also points to the report of the Chicago Fire Department EMS response which states that Jamica informed paramedics that on March 28 Malcolm was caring for J.H.'s sibling when the baby would not

stop crying, the "father became enraged and shook the baby violently" then picked him up and slammed him against a wall, holding him by the throat. That report also says that upon returning home and hearing of the incident Jamica took J.H.'s sibling and left the location.

¶ 28    On appeal, Jamica argues there is a single "coherent account" that is not "inconsistent *** in any significant way." We agree with Jamica. Based on our *de novo* review of the stipulated evidence, we find that the evidence establishes that on March 28, J.H.'s sibling was healthy and normal, and Jamica left him in his putative father's sole care at multiple times during the day. At some point in the evening of March 28—although we cannot account for the records indicating Jamica returned home from the hospital after 2:00 a.m. we fail to glean the significance if she did—Jamica received a report that Malcolm had seriously abused J.H.'s sibling. Jamica immediately checked on both children and they appeared to be fine. Malcolm left the home and therefore no longer posed a threat to the children. (At this point, given the severity of her roommate's description of the abuse and the fact J.H.'s sibling appeared normal, Jamica would not have been unreasonable not to have perceived at that time that Malcolm was a threat to the children.) The next morning, Jamica observed some bruising to the sibling's face and a red spot on his eye. J.H.'s medical records indicate he had a similar spot on his eye before and he appeared otherwise normal. He took his bottle, smiled, and laughed. Jamica did not seek emergency medical care for the bruises on J.H.'s sibling's face. Later that day, J.H.'s sibling's cry became different, he would not take his bottle, and he seemed "out of it." Jamica immediately sought emergency medical care. Admittedly she did not call an ambulance but rather chose to have Javonda drive her to the emergency room—again, a not totally unreasonable choice under the circumstances. At all times, J.H. was unharmed and not at risk.

¶ 29    The narratives recorded by the medical personnel do contain inconsistencies, particularly the EMS report.  Nonetheless, we find no attempt to minimize her own role in J.H.'s sibling's injuries, to protect herself from the consequences, or to evade the involvement of the State from these inconsistencies, including in the EMS report, which the GAL argues is evidence of a risk of harm to J.H.  All of Jamica's accounts are consistent as to her observations of J.H.'s siblings and what she did and did not do for them.  Jamica did not evade the fact she did not take J.H.'s sibling to the emergency room on March 28th or immediately upon seeing that his face was bruised.  She did not deny allowing the children to sleep in a bedroom with Malcolm after receiving the report of his then-alleged abuse from her roommate.  We do not find evasion, particularly evasion indicative of a substantial risk of abuse or neglect of J.H., in this case.  *Cf. In re Adam B.*, 2016 IL App (1st) 152037, ¶ 43 (where the mother told DCFS the minor was burned on a space heater but did not allow investigator to see alleged instrument of burn, then later claimed not to know how burn occurred; and the mother claimed to have taken the minor to the hospital immediately upon noticing a bruise but later told a social worker that she had noticed the bruise five days earlier).  Regardless, the question is whether Jamica failed to "exercise the care that circumstances justly demand[ed]" or whether she "breach[ed] [her] duty to ensure a safe and nurturing shelter for [her] children."  *In re Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 26.  We find the GAL's arguments unpersuasive.

¶ 30    The GAL also argues that Jamica's failure to seek medical attention for J.H.'s sibling supports finding J.H. abused and neglected because, the GAL argues, J.H.'s sibling's injuries "were severe, and Jamica should have called 911 immediately after discovering" them (emphasis omitted); and in fact she should have called 9-1-1 "immediately after being told by her roommate, Will, that Malcolm had body-slammed [J.H.'s sibling] against a wall, choked him,

and punched him in the face." The GAL concludes that "the severity of Jamica's medical neglect, her misleading claims on the sequence of events, and the likelihood she knew (after being told by Will) that Malcolm beat [J.H.'s sibling] on the night of March 28, supports neglect and abuse findings for [J.H.]" Additionally, the GAL argues the finding of abuse of J.H.'s sibling is sufficient to find neglect of J.H. In support of its argument the GAL attempts to analogize this case to *In re Adam B.*, 2016 IL App (1st) 152037, and *In re Erin A.*, 2012 IL App (1st) 120050. We find both cases distinguishable.

¶ 31 In *In re Erin A.*, 2012 IL App (1st), 120050, ¶ 2, the trial court's finding of medical neglect was based on the mother's failure "to have Erin undergo recommended follow-up blood screening to determine if she had sickle cell disease or merely the trait" and the mother's refusal "to have Erin undergo the recommended follow-up medical care because the child's biological father, Aaron A., did not want the State to get involved in the testing because he did not want to be required to pay child support." The trial court found Erin A.'s sister neglected as a result of an injurious environment "in part on the doctrine of anticipatory neglect in that *** her sibling Erin had been found to have been neglected" and in part based on the father's threat to "shoot up the neighborhood if anyone tried to take away his children." *Id.* ¶ 3. The evidence at the adjudicatory hearing was that the child screened positive for possible sickle cell disease at birth and "would have to be rescreened again after six months to determine if she actually had the disease." *Id.* ¶¶ 10-11. The evidence was that sickle cell disease "can be extremely painful. A mother whose baby is suffering from undiagnosed sickle cell may not know why the baby continues to cry." *Id.* ¶ 15.

¶ 32 This court affirmed the trial court's finding that Erin A. was neglected as a result of the failure to have her undergo recommended follow-up periodic blood screening to determine if she

had sickle cell disease or merely the trait. *Id.* ¶ 30. This court also held that the finding the sibling was neglected as a result of an injurious environment was supported by the manifest weight of the evidence. *Id.* ¶ 31. This court wrote that

> "[e]vidence that the parents had neglected to provide adequate medical care for Erin was admissible as evidence concerning an injurious environment for Alicia. In considering this evidence, the trial court took into account the circumstances surrounding the neglect of Erin, but also evidence that the couple fought frequently and that Aaron A. had made threatening remarks that he would shoot up the neighborhood if anyone tried to take away his children." *Id.* ¶ 35.

This court found that "[v]iewing the evidence presented at the adjudicatory hearing in its totality, we find that the trial court's finding that Alicia was neglected as a result of an injurious environment was not against the manifest weight of the evidence." *Id.* ¶ 35.

¶ 33 We find the circumstances surrounding the neglect of J.H.'s sibling in this case are not like the circumstances surrounding the neglect of the sibling in *Erin A.* This case is distinguishable in that *Erin A.* did not involve a recent injury to the minor's sibling (there is no evidence abuse occurred any earlier than March 28th and Jamica sought medical care the next day), or an injury to the minor's sibling that may or may not have fully manifested at the time of any delay in seeking medical care.

¶ 34 Having found the GAL's reliance on *In re Adam B.* and *In re Erin A.* misplaced, we find the State failed to establish by a preponderance of the evidence that J.H. "was placed at a probable and substantial risk of harm as a result of the neglect of his siblings." *In re Arthur H.*, 212 Ill. 2d at 470. The evidence is not sufficient to reasonably conclude by a preponderance of the evidence that "a recurrence of what occurred with" J.H.'s sibling is probable with J.H. *Cf. In*

*re S.S.*, 313 Ill. App. 3d 121, 128 (2000) (holding "we believe it was reasonable for the trial court to conclude that a recurrence of what occurred with A.T. is probable between K.T. and S.S."). Our supreme court has cautioned that "the natural ties between parents and their children may not be severed on the basis of mere speculation." *In re Arthur H.*, 212 Ill. 2d at 477-78. The GAL's argument that J.H. witnessed his sibling's abuse, and its claim as to why Jamica may have been reluctant to call 9-1-1, are nothing more than speculation. See *In re Edricka C.*, 276 Ill. App. 3d 18, 30 (1995) ("We agree with respondent that *** the trial court based its findings too much on speculation."), *In re Arthur H.*, 212 Ill. 2d at 476 ("the State adduced no evidence at the adjudicatory hearing in the cause at bar that Arthur Jr. had ever witnessed any abuse or neglect."). We find that the stipulated facts in this case provide no evidence, other than speculation, that J.H. is at a risk of harm from Jamica. See *id.* at 470 (finding trial court's holding of anticipatory neglect against the manifest weight of the evidence where "the State failed to present any evidence concerning the degree of risk of harm" to the minor at issue "with respect to the care and conditions he experienced"), *In re Edricka C.*, 276 Ill. App. 3d at 30. J.H. is healthy, and there is no evidence of any prior incidents with J.H. See *In re Edricka C.*, 276 Ill. App. 3d 18, 30 (1995) (relying on fact the minor lived with his mother without incident and was in perfect health to reverse trial court's finding of anticipatory neglect).

¶ 35    We are not persuaded by the GAL's reliance on *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶ 85, where this court found that although "there is no *per se* rule, we conclude that under the facts of this case, the same evidence supporting the findings of abuse and neglect for Courtney certainly supports a finding of neglect for Chelsea." *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶ 85. This court held, in part, that "[t]he trial court could reasonably find that, given the respondents' inability or unwillingness to recognize injuries to six-month-old

Courtney, three-year-old Chelsea was at similar risk of delayed treatment should she be injured." *Id.* However, this court also recognized that "[c]ases involving allegations of neglect *** are *sui generis*, and must be decided on the basis of their unique circumstances."." (Internal quotation marks and citation omitted.) *Id.* ¶ 82. In *Chelsea H.*, the trial court specifically found more credible the testimony of the State's expert in child abuse pediatrics, who testified, in part, as follows with regard to the injury the mother was unable or unwilling to recognize (in addition to extensive other testimony about the presentation of the child's injury and the parent's delay in seeking treatment):

> "Dr. Glick testified that Courtney would have cried in pain upon the original fractures, as well as upon the refracture. Dr. Glick opined that Courtney would have been in noticeable pain for the first few days after the original injury, including when her clothes were changed or when she was bathed. Dr. Glick also testified, based upon her review of DCFS interviews and medical records, that the respondents had been aware that Courtney was not using her left arm properly for two or three days before October 4, 2013, which she described as 'medical neglect.' " *Id.* ¶ 24.

Nothing approaching that level of obliviousness or disregard of a child's injury is present in this case. There is no evidence in this case similar to that in *Chelsea H.* indicating Jamica should have been aware of the severity of J.H.'s sibling's injury sooner. There is no medical testimony about how J.H.'s sibling would have demonstrated the severity of his injuries on March 28th (other than, again, the GAL's speculation). The delay in seeking treatment in this case is comparatively minor to that in *Chelsea H.* In sum, *Chelsea H.* is of no help to our decision in this case.

¶ 36    We also find that the GAL's attempt to distinguish this case from *Edricka C.* is not persuasive.  The GAL argues this case is distinguishable because J.H. was not born after his sibling, J.H. was present when the abuse occurred, and J.H. was living in the home "when Jamica decided to drive to her friend's mother's house instead of calling 911 for [J.H.'s sibling.]"  While these bare facts may be similar, the GAL's argument fails to examine their context or their application to the law.  The fact the sibling was born after the abuse occurred and did not witness it (a point of speculation in this case) in *Edricka C.* was in fact evidence that the trial court had based its finding of abuse and neglect in *Edricka C.* "too much on speculation."  *In re Edricka C.*, 276 Ill. App. 3d at 30-31.  This court wrote that:

> "While the Juvenile Court Act allows evidence of neglect or abuse of siblings in an adjudicatory hearing, and courts have held that evidence of sibling abuse is *prima facie* evidence of neglect, we find that, here, where two incidents of abuse and neglect occurred years before Zemaj was born, and he has not ever been abused or neglected, the trial court's findings concerning Zemaj come too close to a per se rule of anticipatory neglect."  *Id.*

This court in *Edricka C.* merely applied the rule that "[t]here is no *per se* rule of anticipatory neglect in Illinois, and each case concerning the adjudication of minors must be reviewed according to its own facts" (*In re J.P.*, 331 Ill. App. 3d 220, 235 (2002)), the same rule we apply in this case.

¶ 37    In this case the facts are there is no evidence of a history of ignoring serious injuries to either child.  There is no evidence that before March 28th Jamica had reason to believe Malcolm would harm the children—despite his own neglect of his mental health issues there is no evidence of any prior incidents—and, therefore, there is no evidence of a history of ignoring

such risks that will be repeated with J.H. We note that most of the GAL's arguments presume an absolute acceptance of the roommate's report of Malcolm's conduct, which the stipulated evidence partially contradicts. That Jamica may have acted sooner in light of all of the facts known to her—including her roommate's report of Malcolm's abuse and the bruises to J.H.'s sibling's face—does not make it probable J.H. will be subject to abuse or neglect. At the time, Jamica had no reason to believe Malcolm would have harmed the children, which he vehemently denied at the time of the accusation, and Jamica reasonably believed the bruises resulted from grabbing J.H.'s sibling's face and not from the type of abuse her roommate described. J.H.'s sibling appeared normal, making the roommate's report potentially unworthy of belief. See *In re Arthur H.*, 212 Ill. 2d at 468-69 ("Each case concerning the adjudication of minors, including those cases pursued under a theory of anticipatory neglect based upon the neglect of a child's sibling, must be reviewed according to its own facts."). The evidence is that once Jamica realized the gravity of J.H.'s sibling's situation she immediately took appropriate steps to obtain emergency medical care for him.

> "Juvenile court is a forum most caregivers do not desire to enter but are compelled to by circumstances beyond their control. In the context of neglect and abuse cases, the Juvenile Court Act allows the State to intervene in the decision making of parents, custodians, and/or guardians of children under very narrow circumstances. ***
>
> The juvenile court judge is not required to make every child a ward of the court based on the State's petition, but must selectively designate children to become wards of the court, who otherwise do not have a parent or parents who

will act in the best interests of the children without some degree of court intervention." *In re C.L.*, 384 Ill. App. 3d 689, 694-95 (2008).

¶ 38 Based on the totality of the evidence we hold the State failed to meet its burden to prove the allegations of abuse and neglect with respect to J.H.

¶ 39                                    CONCLUSION

¶ 40 For the foregoing reasons, the circuit court of Cook County is affirmed.

¶ 41 Affirmed.