2021 IL App (1st) 181224-U

No. 1-18-1224

Order filed February 25, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 85 CR 10757 |
| | ) | |
| DREW TERRELL, | ) | Honorable |
| | ) | Joseph Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Petition to vacate judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401) (West 2008) was properly denied after an evidentiary hearing was held, and the circuit court did not abuse its discretion regarding the qualification of an expert witness and admission of his testimony.

¶ 2    Following a bench trial, defendant Drew Terrell was convicted in 1986 of murder and aggravated criminal sexual assault. In 2009, he filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (Civil Code) (735 ILCS 5/2-1401 (West 2008)),

arguing that his conviction should be vacated based on alleged favorable postconviction DNA testing results. Following an evidentiary hearing, the circuit court denied defendant's petition to vacate his conviction and sentence, finding that he failed to show actual innocence based on newly discovered evidence.

¶ 3    On appeal, defendant argues that he is entitled to a new trial because the newly discovered DNA evidence undermined confidence in the outcome of his trial. Alternatively, he argues that he should receive a new evidentiary hearing on his section 2-1401 petition because the circuit court abused its discretion by failing to strike the testimony of the State's witness Dr. Richard Staub and by qualifying him as an expert in forensic biology.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                             I. BACKGROUND

¶ 6    Defendant Drew Terrell was indicted for murder and aggravated criminal sexual assault based on allegations that on August 27, 1985, he sexually assaulted and beat fifteen-month-old L.H. to death when she was left in his care.

¶ 7    Defendant filed a pretrial motion to suppress the statement he gave to the police and an assistant State's attorney (ASA), claiming that he was not advised of his rights, any statement he gave was the result of physical or mental coercion, and he was under the influence of drugs. At the hearing on the motion, three Chicago police detectives and an ASA testified that they advised defendant of his rights, observed no signs of intoxication, and did not threaten, strike or coerce

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

him in any way. The ASA testified that defendant appeared to be alert, sober and coherent, his answers were responsive to the questions, and he said the police had treated him well.

¶ 8    Defendant testified that he was under the influence of "PCP," which was marijuana laced with embalming fluid, when he gave his statement to the police and ASA; the second police officer defendant spoke to did not advise him of his rights; and Detective Peter McManamon pushed him in the chest and demanded that defendant tell him something.

¶ 9    The trial court denied defendant's motion to suppress his statement, finding that all the police advised defendant of his rights, he did not ask for a lawyer, and he gave his statement freely and voluntarily.

¶ 10    At the bench trial, the victim's mother, M.H., testified that she and the victim lived in an apartment with defendant and his mother. M.H. explained that the only way to lock the apartment was by someone being present to lock it from the inside. When M.H. left for work on the morning of the date of the offense, L.H. had no injuries and M.H. left her in the care of defendant's mother. Later that day, defendant telephoned M.H. and said that L.H. had pulled a stereo down on herself and was at St. Anthony Hospital in a coma. L.H. was later transferred to Cook County Hospital (CCH), where she died.

¶ 11    When Chicago police department Officer John Gantz and Detective James Clemmons separately questioned defendant at St. Anthony Hospital, defendant said that he was alone with L.H. and believed her injuries were caused by the stereo falling on her. When Detective Clemmons spoke with a physician who treated L.H., the physician said that a laceration that extended from L.H.'s vagina to her anus was not consistent with defendant's falling stereo story. Detective

Clemmons saw bruises on L.H.'s face, head, back and stomach and saw blood running from her vagina when the doctor opened her diaper. Detective Clemmons took defendant to the station for questioning.

¶ 12    At the station, defendant waived his *Miranda* rights and spoke with Detectives Robert Ginko and Thomas Lahm at 3 p.m. for 10 minutes. Defendant stated that he was alone with L.H. in the apartment and heard a noise that sounded like something falling. He walked from the bathroom into the bedroom and discovered L.H. lying on her back. She had a bruise on her face, and stereo components were on her leg and above her head. Defendant's mother came home shortly thereafter and took L.H. to the hospital.

¶ 13    ASA James Sullivan interviewed defendant at 6:45 p.m. for 25 minutes in the presence of Detectives McManamon and Philip Nuccio. Defendant gave an oral statement during the interview. Then, in the presence of a court reporter, defendant gave a statement that was reduced to writing and signed by defendant. This statement was admitted into evidence. According to this statement, defendant was alone with L.H. at about 10 a.m. when his mother went to the currency exchange to cash a check. Defendant carried L.H. into the bedroom and put her on the bed next to him. When L.H. woke up and began to cry, defendant struck her on the back with his open hand. L.H. continued to cry, so defendant changed her diaper. She continued to cry, so defendant struck her again with an open hand on the side of her face. He picked her up and put her on her back across a pillow. She continued to cry so he hit her four or five times in the stomach with a closed fist. He noticed she had a bowel movement, so he changed her diaper but did not fasten it. Then he put his "hand in her and started handling her." He was "crazy I guess" and "looking for a pain

response" when he first inserted a Q-tip and then his finger into her vagina a couple of inches, "up to the bone and there around the bone" for about "a minute or two." He found it difficult to put his finger into her vagina. L.H. "hollered for a few minutes, then stopped hollering." He continued this until his mother knocked on the door. He "sort of panicked" and quickly put the diaper on L.H. and went to the door. When his mother entered the apartment, he told her that L.H. had accidentally pulled the stereo onto herself "to make a cover up for the bruises" that were on L.H.'s body. Defendant told the ASA that he had put the stereo on the floor when he first saw the bruise on L.H.'s face, which was before he put his finger in her vagina. He stated that he been treated well by the police and ASA and had not been threatened.

¶ 14    Cook County medical examiner and forensic pathologist Dr. Robert Stein performed the autopsy on L.H. and described the nature and extent of her injuries. His external examination revealed injuries to her left and right temporal areas, left eye, the left side of her face, her back, the upper portion of her right dorsum, her left wrist, her vagina, and her rectum. The internal examination revealed hemorrhaging to L.H.'s head, kidneys, stomach, and pleural cavities. Both lungs were collapsed, the epicardium was contused, and two sutures were present. The liver was found to have a jagged type of laceration. There was blood present in the peritoneal cavity and pelvis. In addition, there were lacerations to the vagina and rectum, tearing of the mesentery, and a hemorrhage of the fatty tissue in the pubic area. Dr. Stein concluded that the cause of death was multiple external injuries caused by blunt trauma as well as lacerations to the vagina and rectum. The injuries were recent and produced before death. Given the extent of the injuries, L.H. could

only have lived a very short time. She had been in shock and the injuries to her genital area could be caused by a finger and Q-tip being inserted into the vagina and rectum.

¶ 15    Defendant testified that he was left alone with L.H. at about 9:30 a.m. when his mother went to the currency exchange. He took L.H. to the hospital at about 11 a.m. and told the police that it appeared as though the stereo had fallen on her. On cross-examination, defendant denied that he watched L.H. when his mother went to the currency exchange, asserting that he "stepped out" for about 40 minutes while his mother was gone and left L.H. alone in the apartment. He claimed that he went "here, there, everywhere, wherever" and spoke to "associates" while he was gone, but could not remember any of their names. When he returned to the apartment, it appeared as though a stereo had fallen on L.H. Later, he testified that he heard the stereo fall after he returned to the apartment. Defendant also denied portions of his written statement but conceded that the words in the statement were his own. He testified that he was not told what to say and was not physically beaten by the police. He claimed, however, that he gave a statement to the ASA because a police officer had confronted him and asked him whether he knew what happened to people who did not cooperate with the police. On redirect examination, defendant testified that the statements he made to the police at the hospital were true.

¶ 16    The trial judge found defendant guilty of murder and aggravated criminal sexual assault, stating that defendant's statements in his court-reported statement, which occurred before the autopsy was performed on L. H., were consistent with L.H.'s injuries, defendant admitted that no one told him what to say, and defendant's trial testimony was not credible.

¶ 17    Defendant waived a jury for sentencing and was found eligible to receive the death penalty.

¶ 18    At the sentencing hearing, Dr. Demetra Soter, an expert in the field of pediatric medicine, testified that she was the CCH pediatric attending physician on August 27, 1985, at 1:30 p.m. when L.H. was transferred from St. Anthony Hospital to CCH. Dr. Soter observed that L.H. had an IV, was receiving blood and fluids, was pale and cold, and had bruises over her face, chest and back. L.H.'s abdomen was distended and tense, which indicated there was a trauma or rupture to her bowels. L.H. was in shock, not conscious, and fresh blood was coming from her vagina and rectum. One tear to her very torn vagina was large enough to "admit almost a hand." All the skin at the back of her vagina was completely torn out so that the tissue underneath was visible. As a result of all the tears, L.H.'s vagina was three to four times the size of a baby's normal vagina. L.H. also sustained large tears to her rectum.

¶ 19    Various life-saving procedures, including blood transfusions, were performed on L.H. Although Dr. Soter administered tremendous amounts of fluids and blood to L.H., her blood pressure only went up a little. Dr. Soter put a needle inside L.H.'s belly and drew fresh, non-clotting blood from her abdomen, at which point, she was immediately taken to the children's operating room. When she was "opened up" a liter of blood came out, and Dr. Soter observed that L.H. had a tear completely across the liver and a tear to the mesentery. Dr. Soter testified that it would take a tremendous amount of force to split the liver in half and injure the mesentery. After L.H. was scrubbed and prepped for surgery, she was given anesthesia and the doctors further explored to ascertain the extent of the injuries to her vagina and rectum. Dr. Soter testified that tremendous force and repeated trauma to the vagina and rectum were necessary to cause so much damage because the skin that was torn away from L.H. was approximately 1.5 inches thick. When

Dr. Soter identified a photo of L.H.'s vagina in the operating room showing injuries, Dr. Soter indicated that L.H. had "been cleaned up" but there was "still blood coming from there."

¶ 20    In further aggravation, the State presented evidence that defendant had two prior felony convictions for robberies that occurred on September 7, 1984, and February 18, 1985. Detective McManamon testified that he determined from St. Anthony's Hospital that defendant's mother was the person who brought L.H. to the hospital.

¶ 21    In mitigation, defendant's father testified that he had no problems with defendant, who did not get into trouble until after defendant's mother took over custody. Defendant's stepmother testified that defendant had a hard life and his problems were attributable to living with his mother. Defendant's cousin and godmother, who believed defendant was innocent of these crimes, testified that defendant's mother was a bad influence on him and he was covering up for her when he made the inculpatory statements.

¶ 22    Following arguments in aggravation and mitigation, defendant addressed the court. He again denied committing the murder of L.H. and asserted that he made his incriminating statement to law enforcement out of fear. He asserted that he loved L.H. as if she were his own child and had no reason to injure her. He stated that he loved children, had two children of his own and worked at a childcare center. In August 1986, the trial court sentenced him to death for murder and a consecutive extended term of 60 year's imprisonment for aggravated criminal sexual assault.

¶ 23    On direct appeal to the Illinois Supreme Court, defendant challenged, *inter alia*, the denial of his motion to suppress his statements, the sufficiency of the evidence establishing his requisite mental state to sustain a murder conviction, the constitutionality of the criminal sexual assault and

aggravated criminal sexual assault statutes, and alleged sentencing errors, including the court's consideration of a victim impact statement. The court affirmed defendant's conviction but vacated his sentences, finding that admitting the victim impact statement of L.H.'s mother was error, and remanded his case for a new sentencing hearing. *People v. Terrell*, 132 Ill. 2d 178 (1989).

¶ 24   On remand, defendant elected to proceed by way of a jury. The evidence at his second death penalty hearing included Dr. Nancy Jones' testimony that some of the bruising on L.H.'s face was inconsistent with a hand or fist and could have been caused by an object. Dr. Jones stated it was unlikely that a single finger inserted into the vagina could have caused the injuries to L.H.'s vagina and rectum. Furthermore, L.H.'s injuries were not consistent with defendant's bedroom stereo falling on her.

¶ 25   Defendant was again found eligible for the death penalty and sentenced to death. He filed a post-sentencing motion in arrest of judgment, which argued that he confessed to save his mother, who actually committed the crimes. The circuit court denied the motion and issued an execution order, and the Illinois Supreme Court affirmed his death sentence in 1998. One of the issues defendant raised in that direct appeal argued that the circuit court erred by preventing him from presenting evidence that his mother had committed the crime. The supreme court, however, rejected that argument, finding defendant's theory of his mother's guilt "too remote and speculative." *People v. Terrell*, 185 Ill. 2d 467, 500 (1998).

¶ 26   Meanwhile, in 1997, defendant had filed *pro se* his first petition for postconviction relief, raising numerous allegations, including ineffective assistance of counsel. Defendant did not allege a claim of actual innocence. In January 2003, then-governor George Ryan commuted defendant's

death sentence to a term of life imprisonment. In May 2003, defendant amended his postconviction petition, arguing that trial counsel failed to present at trial evidence that would have shown defendant had falsely confessed to murder and his mother probably committed the crime. The circuit court granted the State's motion to dismiss the petition in 2004, and this court affirmed that judgement in 2006.

¶ 27    In May 2009, defendant filed a *pro se* successive postconviction, making various challenges to the charges and his consecutive sentence; he did not advance a claim of actual innocence. He amended his successive petition in August 2009, challenging trial counsel's failure to present evidence regarding defendant's mental capacity and background at this motion to suppress hearing and counsel's erroneous advice that persuaded defendant to testify at his trial and waive his right to a jury trial.

¶ 28    In April 2013, the court granted defendant's motion for DNA testing under section 116-3 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/116-3 (West 2012)). Y-Chromosome short tandem repeat DNA (Y-STR DNA) testing was performed on the vaginal and rectal swabs collected by CCH, the vaginal and rectal swabs collected by the Cook County Medical Examiner's Office (CCMEO), and the blood standard taken postmortem from L.H.'s heart by CCMEO. Then the test results were compared to a DNA standard collected from defendant.

¶ 29    The results showed that one male Y-STR DNA profile, from which defendant was excluded, was identified in the CCH swabs; a mixture of two male Y-STR DNA profiles, from which defendant was excluded, were identified in the CCMEO swabs; and a mixture of three male

Y-STR DNA profiles, from which defendant was excluded, were identified in the blood standard taken from L.H.'s heart.

¶ 30    In October 2015, defendant moved the court to vacate his conviction and sentence. After hearing argument on the test results, the court on April 14, 2016, allowed defendant to recharacterize his successive postconviction petition as a petition for relief from judgment under section 2-1401 of the Civil Code, denied his motion to vacate his conviction and granted him an evidentiary hearing.

¶ 31    The evidentiary hearing commenced on September 28, 2017. Karen Abbinanti, a lab analyst at the Illinois State Police Crime Laboratory, testified as an expert in DNA laboratory analysis regarding the Y-STR DNA testing she performed on the samples in this case. She testified that it was unusual for three male DNA profiles to be found in a blood standard from a female's heart. The tests she performed were capable of detecting the smallest amount of DNA available at the time. The male Y-STR DNA profiles were not compared against any databases; they were compared only to defendant's DNA standard. Abbinanti testified about the "clean technique," which required individuals to use lab coats, gloves, and masks in the laboratory and clean their equipment and their working areas with a solution of 10% bleach to prevent contamination of the evidence samples and to protect the analysts from being contaminated by the evidence samples. When she began working as a forensic analyst in 1996, she and her co-workers did not wear masks. Abbinanti testified that possible DNA sources included blood, semen, saliva, bone, hair and skin.

¶ 32    Detective Clemmons testified that during the course of his investigation on August 27, 1985, he went to St. Anthony Hospital and met with the emergency room physician, Dr. Wilk, in

L.H.'s presence. Dr. Wilk lifted a sheet covering L.H., and Clemmons observed injuries to her face, body, vaginal and anal area from approximately two and a half feet away. Neither Dr. Wilk nor Clemmons were wearing masks in L.H.'s presence.

¶ 33 Mary Ann Furlong testified that she previously worked for the Chicago Police Department's crime laboratory between 1979 and 2000. Furlong was qualified as an expert in serology, *i.e.*, the analysis of blood, saliva or semen samples. In 1985, Furlong tested L.H.'s blood sample and the swabs taken by CCH and CCMEO for the presence of semen. All of those samples tested negative for the presence of semen. In 1985, Furlong's workspace was an open table that she shared with other personnel, including men, on a daily basis. Furlong could not recall how many people were in the laboratory with her in 1985 when she tested the victim's samples. Neither Furlong nor the male personnel in the laboratory wore a mask when Furlong tested L.H.'s samples in 1985.

¶ 34 Pediatric trauma physician Soter testified about her treatment of L.H. in the pediatric emergency room at CCH. Dr. Soter's testimony regarding L.H.'s injuries was consistent with her testimony at defendant's initial trial. Dr. Soter explained that she was accompanied by five other doctors, all of whom were men and in close physical proximity to L.H. Every doctor physically examined L.H. and none of them wore masks. Furthermore, it was very unlikely that Dr. Soter wore gloves, and L.H. was covered with clean but not sterile linen. The oral, vaginal and rectal swabs were taken from L.H. with unmasked male physicians in the immediate vicinity. L.H. was already intubated and receiving oxygen when she arrived at CCH from St. Anthony Hospital. She was in shock, comatose and bleeding so much that the CCH doctors had to cut her ankles on

the inside to get IV's into her legs and pour fluid in to bring up her blood pressure. She received one unit of packed red cells at St. Anthony Hospital and another three to four units of blood at CCH. Dr. Soter estimated that L.H.'s total blood volume would have been 700 ccs, and the amount of transfused blood she received would have totaled 1500 ccs. There was no way to know the identities of the blood donors for the transfused blood.

¶ 35     Dr. Richard Staub testified over defendant's objection as an expert in the area of forensic DNA and forensic biology. Dr. Staub testified that he was the property and evidence manager and crime scene investigation unit manager for the Plano Texas Police Department and served as the liaison between the detectives and the DNA laboratories. He also owned a company for which he was a consultant in forensic DNA and relationship testing. He previously was the laboratory director and technical leader at CellMark Forensics in Dallas, Texas from 2000 to 2012 and started a company in Houston in 1993 called Identigene, where he was a research scientist and the laboratory director until 2000. He was involved in the development of the STR technology at Identigene, and was trained in using STR for personal identification. He held a bachelor's degree in mathematics and a master's degree and Ph.D. in genetics with a minor in molecular biology. He was an assistant professor of biology at Carleton College in Minnesota for eight years, where he taught biology, genetics, and molecular genetics, and his work in forensic laboratories involved forensic DNA testing and forensic biology.

¶ 36     When defendant's counsel questioned Dr. Staub about his official job description written by the Plano Police Department, Dr. Staub testified that the word "DNA" did not appear in the job description. Dr. Staub testified that the Plano Police department did not test DNA but rather sent

it out for testing and analysis. His responsibilities included overseeing the crime scene investigation unit and laboratory testing, and he collected DNA evidence for the Plano Police Department. His essential job functions involved forensic biology. He did not have a criminal justice or forensic science degree and did not personally operate a laboratory. He had not personally performed DNA analysis since 2013.

¶ 37    Dr. Staub testified that he was made aware that the victim in this case was a 15-month old female who received medical intervention, including four to five blood transfusions. He reviewed the DNA testing, laboratory reports and data, Y-STR DNA chromosome markers and the actual case files to understand how the work was performed. He reviewed the vaginal and rectal swabs from CCH and CCMEO and the blood standard from CCMEO. He learned the order in which the samples were collected and compared the Y-STR DNA results of all the swabs. He opined that an increasing number of male Y-STR DNA profiles appeared as time passed. The CCH swabs, which were taken before L.H. died, each had one male DNA profile and were consistent with each other. The CCMEO swabs, which were taken after she died, each had two male DNA profiles that were also consistent with each other. Finally, the CCMEO blood standard from L.H. contained three male Y-STR DNA profiles in which the two male profiles in the CCMEO swabs and the single profile from the CCH swabs were included. When Dr. Staub was asked if, based on his training, experience and education, he had "an opinion as to where DNA profiles may come from if the sample being examined was collected from a bleeding wound in a person who had received blood transfusions?", he responded that there was a high likelihood those profiles came from the blood donors of the blood transfusions. Dr. Staub also opined that the three male Y-STR DNA profiles

identified in L.H.'s heart blood sample came from the blood transfusions. All of Dr. Staub's opinions were based on his education, training, experience and protocols that were generally accepted in the forensic science community.

¶ 38     On cross-examination, Dr. Staub testified that defendant was excluded as a contributor to any of the male Y-STR DNA profiles identified in all the samples. Dr. Staub testified that although he could not say for certain that the Y-STR DNA contributor to the CCH swabs was the same person, it appeared to be the same person because each genetic marker where DNA was identified on both swabs was consistent. Similarly, even though the CCMEO swabs were also consistent with each other, it was not possible to say for certain that the contributors to the rectal swab were the same contributors to the vaginal swab. Dr. Staub also testified that there was a strong likelihood that the individuals in the swabs were also the contributors to the blood standard, but a match could not be declared "unless you could deconvolute them into individual profiles."

¶ 39     At the conclusion of Dr. Staub's testimony, defendant moved to strike it because Dr. Staub did not use the words "to a reasonable degree of scientific certainty" in rendering his opinion. Defendant also made an oral motion for a "directed finding at this point," claiming that the State did not produce any proof that explained why defendant's DNA was not present. Defendant argued that the DNA recovered from the blood on L.H.'s body was that of the "real perpetrator," and that if defendant had done the actions set forth in his sworn statement then "vast deposits" of his DNA would have been found on L.H. The circuit court took the motions under advisement.

¶ 40     Defendant called Dr. Karl Reich in rebuttal, and the State stipulated to his qualifications as an expert in forensic DNA analysis and forensic DNA procedure. Dr. Reich testified that he

reviewed laboratory reports, crime laboratory supporting documents, the victim's medical records, the medical examiner's autopsy report, records related to the samples taken from the victim, defendant's court-reported statement, and transcripts from an earlier day of this hearing that included Dr. Soter's testimony. Dr. Reich testified that he took all the materials into consideration when formulating his opinion. However, when Dr. Reich was asked on direct whether the CCMEO autopsy report noted any injuries to the vagina, he responded that the document noted no such injuries.

¶ 41    Dr. Reich opined that, based on defendant's court-reported statement, his DNA should have been present in the victim's vagina and that bleeding would not have washed his DNA away unless friction such as by wiping was applied in addition to the bleeding. Dr. Reich testified that he relied on an article entitled "Detection of Male DNA in the Vaginal Cavity After Digital Penetration Using Y Chromosome Short Tandem Repeats," published in the *Journal of Forensic Nursing* in December 2014. However, Dr. Reich acknowledged that the study in this article was completed in a very controlled group and not compiled from submitted evidence in a forensic laboratory; none of the study subjects were bleeding or menstruating at the time samples were taken; none of the study subjects were forcibly attacked and all the participants were volunteers; and none of the study participants were undergoing medical intervention when their samples were taken.

¶ 42    After the hearing, the matter was continued for the parties to file post-hearing briefs on the issues. In February 2018, the court heard argument on defendant's motion to strike Dr. Staub's testimony and denied it. The court also heard argument on defendant's motions for a directed finding and vacation of his conviction and sentence.

¶ 43    On May 1, 2018, the court issued a written ruling that denied defendant's motions, finding that he failed to show that the DNA results were of such a conclusive nature that they would change the result on retrial because the test results did not exculpate him and the evidence of his guilt was overwhelming. The Court found compelling evidence of defendant's guilt in the fact that he did not take L.H. to the hospital, his mother did. Furthermore, defendant kept changing his stories during the course of the investigation. Initially he claimed that the stereo caused L.H.'s injuries in his statements to L.H.'s mother on the telephone, to Officer Gantz and Detective Clemmons at the hospital, and to Detectives Ginko and Lahm at the police station. Later, defendant made inculpatory statements first to detectives at the police station and again to ASA Sullivan in a court-reported statement. At the trial, defendant returned to his story that the stereo caused L.H's injuries, asserting with no credibility that he was not in the apartment with L.H. when the injuries occurred.

¶ 44    The court found that L.H.'s horrific injuries occurred while she was in defendant's custody and his inculpatory statements in his court-reported sworn statement were compelling. Specifically, defendant stated that he was not coerced, mistreated or threatened by the police and ASA and admitted to smacking and punching L.H. multiple times on her back, stomach and head, penetrating her vagina with his finger and using the falling stereo story to cover up her injuries. The court also found that the medical examiner's testimony regarding L.H.'s injuries was consistent with conduct described in the confession.

¶ 45    The court found that the DNA evidence did not exculpate defendant and would not change the result on retrial. Even though defendant was excluded as a contributor to the DNA found on the swabs and in the blood sample taken from L.H., those items were exposed to a high risk of

contamination based on the evolving and emergency treatment L.H. received at two hospitals, the absence of mask and glove use by the medical personnel treating her, and the less rigorous laboratory standards at the time regarding the prevention of DNA transfer during testing. The court gave little weight to Dr. Reich's opinion that defendant's DNA should have been present on the vaginal and rectal swabs taken after L.H.'s death and after she had received emergency treatment and undergone emergency surgery for her severe injuries. The court denied defendant's motion to vacate his conviction, concluding that his DNA test results failed to make a showing of actual innocence in light of the overwhelming evidence of his guilt and potential sources of contamination with male DNA.

¶ 46    Defendant appealed.

¶ 47                                    II. ANALYSIS

¶ 48    Section 2-1401 of the Civil Code is a civil remedy that extends to criminal cases and provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated more than after 30 days from their entry. 735 ILCS 5/2-1401(a) (West 2008); *People v. Haynes*, 192 Ill. 2d 437, 460-61 (2000). In a criminal case, a section 2-1401 petition is a remedy to correct all errors of fact occurring in the prosecution of a cause that were unknown to the defendant and court at the time judgment was entered and, which, if then known, would have prevented entry of that judgment. *Haynes*, 192 Ill. 2d at 461. However, a section 2-1401 petition is "not designed to provide a general review of all trial errors nor to substitute for direct appeal." *People v. Berland*, 74 Ill. 2d 286, 314 (1978). Points previously raised at trial and other collateral proceedings cannot form the basis of a section 2-1401 petition for relief. *Id.* at 314-15.

¶ 49 "[A] section 2-1401 petition that raises a fact-dependent challenge to a final judgment or order must be resolved by considering the particular facts, circumstances, and equities of the underlying case." *Warren County Soil and Water Conservation District v. Walters*, 2015 IL 117783, ¶ 50. When a section 2-1401 petition presents a fact-dependent challenge to a final judgment or order, it must set forth specific factual allegations, showing the existence of a meritorious defense and due diligence in presenting the defense and filing the petition. *Id.* ¶ 51. "The quantum of proof necessary to sustain a section 2-1401 petition is a preponderance of the evidence, and the circuit court's ultimate decision on the petition is reviewed for an abuse of discretion. *Id.* Absent an abuse of discretion, the trial court's determination will not be disturbed. *Haynes*, 192 Ill. 2d at 461. A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or when no reasonable person could take the view adopted by the trial court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 50 In *People v. Coleman*, 2013 IL 113307, ¶ 96, our supreme court stated:

> "Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation]. New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the

evidence, when considered along with the trial evidence, would probably lead to a different result."

Here, the trial court denied defendant's section 2-1401 petition after holding an evidentiary hearing, finding that he failed to make a showing that he was actually innocent because the new DNA evidence he presented did not exculpate him and was not of such a conclusive nature that it would change the result on retrial.

¶ 51    On appeal, the parties agree that defendant met his burden to present new, material and noncumulative evidence; they disagree on whether it was so conclusive that it, when considered along with the trial evidence, would probably lead to a different result on retrial.

¶ 52                        A. The DNA Evidence

¶ 53    Defendant argues that the circuit court abused its discretion when it denied his motion to vacate his conviction because confidence in that conviction was undermined by the newly discovered DNA evidence, which created a "great enough" likelihood of a different result on retrial. Specifically, defendant contends that the evidence of his guilt was weak, no expert rebutted Dr. Reich's expert opinion that defendant's DNA should have been found on the vaginal and rectal swabs taken from the victim, and defendant's exclusion as a contributor to the DNA evidence found on the vaginal and rectal swabs corroborated his claim that his sworn statement was coerced and false.

¶ 54    The State responds that defendant did not prove his case because the new evidence was not exculpatory. Specifically, the State argues that the three DNA profiles found on L.H. resulted from the multiple blood transfusions she received; those profiles were found in her heart, not just the

areas of sexual injury, and did not come from another offender; defendant failed to explain how the evidence, as a whole, exonerated him; the DNA evidence did not undermine confidence in his inculpatory statements; Dr. Reich's expert testimony was entitled to no weight because he based his findings on a study that was inapplicable to the instant case and misunderstood the facts of this case; and the evidence at trial and in the record was substantial. The State contends that the circuit court did not abuse its discretion because defendant did not show that it was more likely than not that no reasonable juror would have convicted in light of the new evidence.

¶ 55    Defendant cites *People v. Davis*, 2012 IL App (4th) 110305, ¶ 62, for the proposition that his burden to show that the new DNA evidence would probably change the result on retrial meant that he had to show only that "the likelihood of a different result was great enough to undermine confidence in the outcome of the trial." We reject this proposition and note that this lower burden of proof set forth in *Davis* was subsequently criticized as a misstatement in *People v. Whalen*, 2020 IL App (4th) 190171, ¶¶ 86-102. We conclude that the circuit court here correctly followed the applicable burden of proof as set forth in *Coleman*, *i.e.*, defendant must prove that the new DNA evidence was so conclusive that it, when considered along with the trial evidence, would probably lead to a different result." 2013 IL 113307, ¶ 96.

¶ 56    Defendant also submitted a motion to cite *People v. Robinson*, 2020 IL 123849, as additional authority. We granted the motion, but find *Robinson* too different to be helpful here because that case interprets the Post-Conviction Hearing Act (Act), 725 ILCS 5/122-1 (West 2020), "which provides a different form of statutory relief than does section 2-1401, notwithstanding that [the Act], like section 2-1401, allows for collateral relief from judgments,

albeit only collateral relief in criminal cases for constitutional violations." *People v. Vincent*, 226 Ill. 2d 1, 11 (2007). *Robinson* addressed the very different issue of the standard to be applied at the pleading stage of a successive postconviction petition under the Act; the instant case involves defendant's burden of proof at a section 2-1401 evidentiary hearing. Furthermore, *Robinson*'s passing reference to *Davis* merely cited the precedent that the key consideration of the conclusiveness factor of an actual innocence claim is probability. *Robinson*, 2020 IL 123849, ¶ 48 ("new evidence need not be entirely dispositive to be likely to alter the result on retrial"). *Robinson* does not cite or adopt *Davis* for the proposition urged by defendant on appeal here, *i.e.*, he must prove under the conclusiveness factor of an actual innocence claim only that the likelihood of a different result was great enough to undermine confidence in the outcome of the trial. See *Whalen*, 2020 IL App (4th) 190171, ¶ 100 (criticizing *Davis* for equating and conflating the substantive definition of the conclusiveness factor with the reasonable probability standard applied by the United States Supreme Court for the constitutional violations at issue in *Brady v. Maryland*, 373 U.S. 83 (1963), and *Strickland v. Washington*, 466 U.S. 668 (1984)).

¶ 57    Defendant was not convicted based on biological evidence that tied him to the crimes, and the fact that he was excluded from the DNA profiles found on the postmortem vaginal and rectal swabs and the blood sample drawn from L.H.'s heart does not establish that he did not commit the crimes. The trial evidence established that L.H.'s horrific injuries occurred while she was in defendant's custody and his uncorroborated testimony about leaving her alone in the unlocked apartment for 40 minutes to go to some unspecified places and speak to unidentified associates lacked any credibility. Defendant's contention that his mother injured L.H. was not persuasive

because defendant's mother, not defendant, brought the injured L.H. to the hospital. Defendant's shifting and contradictory stories about the falling stereo causing L.H.'s injuries and his presence when those injuries occurred were compelling components of the substantial evidence of his guilt.

¶ 58    Furthermore, the voluntary nature of his court-reported statement to the police and ASA was previously adjudicated when the trial court properly denied his motion to suppress that statement.  In that statement, defendant admitted responsibility for injuring L.H. by describing how he struck and punched her multiple times in the head, stomach and back. The severe nature of her injuries refuted defendant's attempt to minimize his conduct by telling the police and ASA that he inserted only a Q-tip and his finger into L.H.'s vagina. Elsewhere in his sworn statement, defendant admitted that he put his "hand in her and started handling her." He said he was "crazy" and "looking for a pain response," admitting that he penetrated L.H.'s vagina "up to the bone and there around the bone" for about "a minute or two." He continued this conduct until his mother returned to the apartment and knocked on the locked door. At the trial, the medical examiner testified that L.H.'s injuries were consistent with conduct described in defendant's sworn statement.

¶ 59    Even though defendant was excluded as a contributor to the male DNA profiles found in the vaginal and rectal swabs and blood sample, that evidence was not exculpatory and would not change the result on retrial. The trial and hearing evidence established that L.H. was bleeding profusely, including from her vaginal and rectal areas, and received several blood transfusions during her emergency medical treatment and the surgical attempt to save her life. Several male medical personnel, who wore neither masks nor gloves, interacted with L.H. Furthermore, the

testing laboratory in 1985 did not observe the more meticulous clean techniques currently in place to prevent DNA transfer.

¶ 60    Finally, Dr. Reich's expert opinion that defendant's DNA should have been found on the vaginal and rectal swabs was not entitled to much weight because he seemed unaware of the severe injuries to L.H.'s vagina. Furthermore, the study he relied on to support his opinion was not applicable to facts of this case, which involved a sexual assault victim who suffered severe injuries that included her vaginal and rectal areas, bled profusely, received emergency medical treatment to her vaginal and rectal areas after the commission of the crime and was scrubbed and prepped for surgery before those areas were swabbed to collect DNA.

¶ 61    We conclude that the circuit court did not abuse its discretion by denying defendant's motion to vacate his conviction because we cannot say that no rational person would agree with the circuit court's decision that the DNA evidence was not so conclusive that it would have probably changed the result on retrial.

¶ 62                                    B. Expert Witness

¶ 63    First, we address defendant's argument that the circuit court abused its discretion by qualifying Dr. Staub as an expert in forensic DNA and forensic biology because no reasonable person would agree with the court's decision. Specifically, defendant argues that Dr. Staub's official job description as a manager of physical and technical services of a police department did not refer to DNA or forensic biology; he did not perform any DNA analysis as part of his current job functions; his curriculum vitae did not indicate that he was ever trained as a crime scene investigator or forensic biologist; he never taught forensic biology; he had not personally done any

DNA analysis since 2013 and had not operated a DNA laboratory since 2012; and he had not authored any publications on the subject of DNA since 2009.

¶ 64    The admission of expert testimony is within the discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006). In determining whether there has been an abuse of discretion, a court of review does not substitute its judgment for that of the trial court. *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶ 60. "[I]t is well settled that [a] person will be allowed to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons, and where his testimony will aid the trier of fact in reaching its conclusions." *Thompson*, 221 Ill. 2d at 428.

¶ 65    The circuit court heard thorough testimony from Dr. Staub about his qualifications, followed by a vigorous and lengthy cross-examination. The court heard that Dr. Staub held a bachelor's degree in mathematics and a master's degree and Ph.D. in genetics with a minor in molecular biology. He was a college assistant professor of biology for eight years where he taught biology, genetics and molecular genetics, and his work in forensic laboratories involved forensic DNA testing and forensic biology. In 1993, he started a company that performed DNA identification analyses, where he was a research scientist and the lab director until 2000. He helped develop that company's STR technology and was proficient in using Y-STR DNA testing for personal identification. Then he was the laboratory director and technical leader at Cellmark Forensics for twelve years until 2012. He currently was a consultant in forensic DNA and served as a police department's liaison between its detectives and DNA laboratories.

¶ 66    We conclude that the court did not abuse its discretion by finding that Dr. Staub was qualified to testify as an expert in forensic biology and forensic DNA based on his education, training and experience.

¶ 67    Next, defendant argues the circuit court abused its discretion by admitting Dr. Staub's testimony even though he did not offer his opinion with a reasonable degree of scientific certainty. This argument lacks merit. Dr. Staub was not required to preface his opinion with the phrase "within a reasonable degree of scientific certainty."

> "[W]hen an expert testifies to a reasonable degree of certainty within a given field, it means that others in the field would agree with the expert's opinion. However, 'there is no magic to the phrase itself.' *Dominguez v. St. John's Hospital*, 260 Ill. App. 3d 591, 595 (1993). 'If the [expert's testimony] reveals that his or her opinions are based upon specialized knowledge and experience and grounded in [scientific, medical, architectural, etc.] thought, it is of no consequence that the witness has failed to preface the opinions with the phrase, "*within a reasonable degree of certainty.*" ' (Emphasis added.) *Id.*" *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 28 (2008).

Dr. Staub reviewed all of the DNA reports, laboratory data, case files, and the Y-STR Chromosome markers. He knew that L.H. was an infant female who received multiple blood transfusions and medical intervention for injuries to her vagina and rectum. The circuit court did not abuse its discretion by admitting Dr. Staub's opinion because he possessed the requisite education, training

and experience, and his opinion was based upon his qualifications and accurate facts pertaining to this case.

¶ 68    Finally, defendant argues that Dr. Staub's opinion was mere speculation and conjecture because his testimony included phrases like "most likely" and "it appears."

¶ 69    The record establishes that Dr. Straub's opinion clearly and unambiguously stated that there was an increasing number of male Y-STR DNA profiles as time passed; the CCH vaginal and rectal swabs each had one male profile and were consistent with each other; the CCMEO vaginal and rectal swabs each had two male Y-STR DNA profiles that were also consistent with each other; and the CCMEO blood standard from the victim contained three male Y-STR DNA profiles in which the two male profiles in the CCMEO swabs and the one profile from the CCH swabs were included. Furthermore, when he was asked, based on his training, experience and education, if he had an opinion as to where DNA profiles could come from if the sample being examined was collected from a bleeding wound in a person who had received blood transfusions, Dr. Staub testified that there was a high likelihood that those profiles came from the DNA of the blood donor from the blood transfusion. When specifically asked for his opinion on the origin of the DNA in the victim's heart standard, Dr. Staub answered: "My opinion is that it came from transfusion donors."

¶ 70    The record does not support defendant's assertion that Dr. Staub's opinion was mere speculation or conjecture, and we find no abuse of discretion in the circuit court's decision to admit his opinion into evidence.

¶ 71                          III. CONCLUSION

¶ 72     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 73     Affirmed.